1  MICHAEL G. KING (SBN 145477)
   mking@hgla.com
2  JANICE M. KROLL (SBN 189975)
   jmkroll@hgla.com
3  HENNELLY & GROSSFELD LLP
   4640 Admiralty Way, Suite 850
4  Marina del Rey, CA 90292
   Tel: (310) 305-2100; Fax: (310) 305-2116
5

6  BRETT LEWIS (pro hac vice)
   blewis@lewishand.com
7  Lewis & Hand, LLP
   45 Main Street, Suite 818
8  Brooklyn, NY 11201
   Tel: (718) 243-9323; Fax: (718) 243-9326
9

10

11 Attorneys for Defendants
   NAVIGATION CATALYST SYSTEMS, INC.; and
12 BASIC FUSION, INC.

13                  **UNITED STATES DISTRICT COURT**

14                  **CENTRAL DISTRICT OF CALIFORNIA**

15

16                        **WESTERN DIVISION**

17

| | |
|---|---|
| 18 VERIZON CALIFORNIA INC.; | Case No. CV 08-2463 ABD (Ex) |
| 19 VERIZON TRADEMARK SERVICES | |
| 20 LLC; and VERIZON LICENSING | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| 21 COMPANY, | |
| 22         Plaintiffs, | |
| 23 | **DATE: June 30, 2008** |
| 24      Vs. | **TIME: 10:00 a.m.** |
| | **CTRM: 680** |
| 25 NAVIGATION CATALYST | |
| 26 SYSTEMS, INC.; and BASIC FUSION, | **HON. AUDREY B. COLLINS** |
| 27 INC., | |
| 28         Defendants. | |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................1

II.  STATEMENT OF FACTS.....................................................................3

   A.  VERIZON'S DNS WILDCARDING SCHEME................................3

   B.  NAVIGATION AND BASIC FUSION .........................................5

   C.  NAVIGATION'S AUTOMATED SCREENING PROCESSES.................6

   D.  ACCURACY OF WHOIS INFORMATION ...................................8

   E.  NAVIGATION'S POLICY REGARDING TRADEMARK
      HOLDERS ...........................................................................9

   F.  ADDITIONAL SCREENING POLICIES ADOPTED ..........................10

   G.  FILTERING OF VERIZON MARKS...........................................11

III. LEGAL ARGUMENT .........................................................................13

   A.  INTRODUCTION ...................................................................13

     1.  Standard For Granting Injunctive Relief .................................13

   B.  PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE
      HARM .................................................................................14

     1.  Plaintiffs Unreasonably Delayed in Seeking
        Injunctive Relief ....................................................................14

     2.  Defendants Have Already Discontinued the
        Allegedly Infringing Activities ...............................................16

   C.  PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF
      IS BARRED BY THEIR UNCLEAN HANDS .................................18

   D.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE
      MERITS OF THEIR CYBERSQUATTING CLAIM.............................20

     1.  Introduction .........................................................................20

     2.  Navigation Did Not Use the Tasted Domains in Bad Faith .......22

   E.  THE SCOPE OF THE REQUESTED RELIEF IS VAGUE AND
      OVERBROAD .........................................................................24

IV. CONCLUSION......................................................................................25

# TABLE OF AUTHORITIES

*Ames Publishing Co. et al. v. Walker-Davis Publications, Inc., et al.*,
372 F.Supp. 1 (D.C. Pa. 1974) ....................................................... 19

*Bambu Sales, Inc. v. Testini*,
12 U.S.P.Q.2d 1479 (E.D.N.Y. 1988) ........................................ 18

*Cadence Design Sys., Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997) ...................................................... 14

*Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985)...................................... 16

*CPC International, Inc. v. Skippy Incorporated*,
214 F.3d 456 (4th Cir. 2000) ...................................................... 19

*eAcceleration Corp. v. Trend Micro, Inc.*,
408 F. Supp. 2d 1110 (W.D. Wash. 2006)................................... 14

*Feathercombs, Inc. v. Solo Products Corp.*,
306 F.2d 251 (2d Cir. 1962) ....................................................... 20

*Grotrian, Helfferich, Shultz, Th. Steinweg Nachf. v. Steinway & Sons*,
523 F.2d 1331 (2d Cir. 1975) ..................................................... 16

*In re Napster Copyright Litigation*,
191 F.Supp.2d 1087 (N.D. Cal. 2002)....................................... 18

*Interstellar Starship Services, LTD v. EPIX, Inc.*,
304 F.3d 936 (9th Cir. 2002) ..................................................... 22

*Japan Telecom, Inc. v. Japan Telecom America Inc.*,
287 F.3d 866 (9th Cir. 2002) ..................................................... 18

*Lasercomb America Inc. v. Reynolds*,
911 F.2d 970 (4th Cir. 1990) ..................................................... 19

*Majorica, S.A. v. R.H. Macy & Co., Inc.*,
762 F.2d 7 (2d Cir. 1985) .......................................................... 16

*Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*,
627 F.2d 628 (2d Cir. 1980) ....................................................... 19

*National Cable & Telecommunications Ass'n v. Brand X Internet Services*,
545 U.S. 967 (2005) ..................................................................... 4

*Nordic Inn Condominium Owners' Ass'n v. Ventullo*,
151 N.H. 571, 864 A.2d 1079 (N.H. 2004)................................ 16

*Phi Delta Theta Fraternity v. J.A. Buchroeder & Co.*,
   251 F.Supp. 968 (D.C.Mo. 1966) ............................................................ 18

*RasterOps v. Radius, Inc.*,
   861 F. Supp. 1479 (N.D. Cal. 1994) ....................................................... 13

*Republic Molding Corp. v. B. W. Photo Utilities*,
   319 F.2d 347 (C.A.Cal. 1963) ........................................................... 18, 19

*Sampson v. Murray*,
   415 U.S. 61 (1974) ................................................................................. 13

*Skippy, Inc. v. CPC Int'l, Inc.*,
   674 F.2d 209 (4th Cir. 1982) ................................................................ 16

*Sony v. Connectix*,
   53 U.S.P.Q.2d 1705 (9th Cir. 2000) ...................................................... 13

*Valeo Intellectual Property, Inc. v. Data Depth Corp.*,
   368 F. Supp. 2d 1121 (W.D. Wash. 2005) ............................................. 16

*Verizon California Inc. et al. v. Maltuzi LLC et al.*,
   CV 07-1732  (C.D. Cal.) (filed Mar. 15, 2007) ..................................... 15

*Verizon California Inc. et al. v. Ultra RPM Inc.*,
   CV 07-2587 (C.D. Cal.) (filed Apr. 18, 2007) ...................................... 15

*Verizon North Inc. et al. v. Internet Reit Inc.*,
   CV 07- 996  (S.D. Tex.) (filed Mar. 23, 2007) ...................................... 15

## <u>STATUTES</u>

15 U.S.C. § 1125(d) .......................................................................................... 2

## <u>TREATISES</u>

5 J. Thomas McCarthy, <u>Trademarks and Unfair Competition</u>
   (4th ed. 2006)............................................................. 13, 14, 15, 16, 18

RESTATEMENT (THIRD) UNFAIR COMPETITION ...................................................... 18

# I. __INTRODUCTION__

A user logs onto the Internet and enters the URL in her browser for her favorite Website, MYFACETUBEBOOK.com, only she misspells the domain name. A Web page pops up offering the user a series of paid advertised links, some to competing goods or services. That user is a Verizon broadband customer and the paid advertising links she is shown are served by Verizon as a part of its DNS wildcarding service. See Affidavit of Matt Wrock ("Wrock Aff."), ¶ 4, and Exhibit A to the Wrock Aff. Verizon makes money every time a user clicks on such an advertisement. Respected commentators have derided the practice.[1] See Exhibits A, B, C, D to the Declaration of Robert Johnson ("Johnson Decl."). Others have branded Verizon as hypocrites for profiting from typo traffic, while at the same time aggressively pursuing typo traffic settlements that winnow out the competition. See Exhibits E, F, G, H, I to Johnson Decl. In other words, Plaintiffs have unclean hands.

---

[1] See, e.g., Martin H. Bosworth, *Verizon Overrides Internet Searches With Its Own Results: Web search "tinkering" raises net neutrality concerns*, Consumer News at http://www.consumeraffairs.com/news04/2007/11/verizon_search.html (last visited June 13, 2008) (noting that "[Verizon's service] also raises the question of whether or not an Internet provider that automatically redirects a user's searches without telling them will also shape the results they do get, such as filtering their searches to get specific results."); Professor Susan Crawford, *Monetizing Disorder*, Susan Crawford blog posting dated November 5, 2007 at http://scrawford.net/blog/category/icann/ (last visited June 13, 2008) (noting that "[w]e don't expect ISPs to be filtering our web browsing requests and inserting themselves into the conversation"). See also David Chartier, *404 might be found: the curious case of DNS redirects*, Ars Technica dated Feb. 13, 2008 at http://arstechnica.com/news.ars/ (last visited June 12, 2008) (citing net neutrality concerns by Professor Tim Wu, Columbia Law School).

Plaintiffs also unduly delayed in moving for injunctive relief.  Plaintiffs make no allegation that the conduct in dispute is newly discovered, nor could they.  Plaintiffs have filed at least five similar actions, starting in March 2007.  Plaintiffs also have access to sophisticated monitoring equipment, which provides them with daily updates of the domain names registered by Navigation Catalyst Systems ("Navigation") and others.  As such, Plaintiffs have known for at least fifteen months, and likely longer, that Navigation was engaged in the conduct complained of herein.  Yet, Verizon took no action, sat on its hands, allowed the so-called irreparable injury to continue unabated, and let the meter on its cybersquatting allegations run up.

In any event, Plaintiffs fail to establish that Navigation acted with the bad faith intent necessary to satisfy the requirements of the Anticybersquatting Consumer Protection Act of 1999, 15 U.S.C. § 1125(d) ("ACPA").  Unlike *real* bad faith actors, Navigation never made any effort to shield its identity.  Prior to this litigation, Navigation had enacted a policy to screen out trademark typos.  Due to Navigation's screening efforts, the overwhelming majority of the domain names in dispute – more than 1,200 of the disputed domain names – were not registered to Navigation at the time the Complaint was filed. See infra § II A; Affidavit of Seth Jacoby ("Jacoby Aff."), ¶ 16, Exhibits A, B to the Jacoby Aff.  Plaintiffs misrepresent both the nature and magnitude of the allegedly infringing domain names registered by Navigation in an attempt to prejudice the Court.

Following the commencement of this action, Navigation implemented additional policies and filters to prevent against the inadvertent registration of trademarked domain

names. <u>See</u> Jacoby Aff., ¶¶ 8, 12, 15, Exhibits C, D to Jacoby Aff.  Navigation has offered to transfer, without charge, any domain names which are similar to the trademarks of others, and, in fact, transferred the 126 disputed domain names to Verizon following the commencement of this action. <u>See</u> Jacoby Aff., ¶ 16.

Accordingly, Plaintiff's Motion for a Preliminary Injunction should be denied for the following reasons:

- Plaintiffs' unclean hands in wrongly asserting their trademark rights to gain an unfair advantage for their competitive typo monetization scheme;

- Plaintiffs' delay of at least fifteen months in seeking emergency injunctive relief and failure to establish irreparable injury; and

- Plaintiffs' failure to establish a likelihood of success on the merits, where Defendants have made, and are making, good faith efforts to screen out domain names similar to trademarks.

Plaintiffs' own actions belie the need for the extraordinary injunctive relief that they seek.

## II. <u>STATEMENT OF FACTS</u>

### A. <u>VERIZON'S DNS WILDCARDING SCHEME</u>

Since at least as early as June 11, 2007, Verizon has been engaging in practices that, although accomplished through different technical means, achieve essentially the same result as Navigation's complained of practices. <u>See</u> Exhibits J, K to Johnson Decl. Specifically, through a feature that Verizon calls "Advanced Web Search" (and otherwise

known in the industry as DNS wildcarding) customers of Verizon's FIOS and DSL broadband services who type in a misspelled or non-existent domain name into a browser are automatically redirected to a Verizon web page "containing suggested links based on the query [the user] entered."[2] See Exhibits J, K to Johnson Decl.  The redirect affects all domain names and sub-domains that have not been registered or simply do not exist. See id.  Through its ISP service, Verizon intercepts a user's request, and rather than showing the user a standard "page not found" response, Verizon instead serves up its own advertisements.  See, e.g., National Cable & Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (explaining how IPSs function).  Verizon even uses the same Yahoo! services to display and monetize advertisements that Navigation uses. See Exhibits N, O, P to Johnson Decl.[3]

Although, as a strictly technical matter, Verizon does not register typographical misspellings of trademarks, Verizon achieves near identical results by simply forging replies from DNS servers, which they can do without having to go to the effort (and expense) of actually registering all those mis-typed domain names.  The consequences of Verizon's DNS redirection are on a much larger scale than anything that Navigation currently does or could ever do and Verizon claims to have a growing market share in

_____

[2] Although Verizon claims that users have the ability to opt out of this feature, there is no simple check box to click; rather, the user is required to follow long, technically-detailed instructions to reconfigure their DNS settings. See Exhibits L, M to Johnson Decl.
[3] See, e.g., Brian Krebs, *When Monetizing ISP Traffic Goes Horribly Wrong*, Security Fix Column dated April 19, 2008 at http://blog.washingtonpost.com/securityfix/2008/04/ (last visited June 13, 2008).

excess of 8.5 million subscribers. <u>See</u> Pl. Mem., p. 9.

Moreover, Verizon's DNS redirection affects *all* iterations of unregistered and non-existent domains, many of which necessarily – and in fact do – consist of domain names that are typographical misspellings of famous trademarks. <u>See</u> Exhibit A to the Wrock Aff.; <u>see also</u> Exhibit Q to Johnson Decl. If there was any doubt about Verizon's practices, the Wrock Affidavit and accompanying list of approximately 100 Web pages served in response to trademark typos of famous brands, lays it to rest.

**B. <u>NAVIGATION AND BASIC FUSION</u>**

Basic Fusion is an Internet registrar accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN"), with its principal offices located in El Segundo, California. <u>See</u> Jacoby Aff., at ¶ 2. Basic Fusion offers bulk registration services to customers seeking to register large numbers of domain names. <u>See</u> Jacoby Aff., at ¶ 2. Basic Fusion currently has a number of third party customers with in excess of 100,000 domain names under registration. <u>See</u> Jacoby Aff., at ¶ 3.

Navigation is an affiliate of Basic Fusion. <u>See</u> Jacoby Aff., at ¶ 1. Navigation uses Basic Fusion's services to register domain names, but it is a separate legal entity. <u>See</u> Jacoby Aff., at ¶ 2. Basic Fusion does not in any way select or control the selection of domain names registered by Navigation. <u>See</u> Jacoby Aff., at ¶ 2. Rather, Basic Fusion simply processes the registration requests made by Navigation. <u>See</u> Jacoby Aff., at ¶ 2.

Both companies are part of the Connexus Corporation ("Connexus"). <u>See</u> Jacoby

Aff., at ¶ 1. Connexus is a premier online, performance-driven marketing platform, offering a diversified, multi-channel approach to connect advertisers with their target customers. <u>See</u> Jacoby Aff., at ¶ 3. As of June 16, 2008, Connexus had 192 employees and other full time staff. <u>See</u> Jacoby Aff., at ¶ 1.

## C. <u>NAVIGATION'S AUTOMATED SCREENING PROCESSES</u>

Navigation owns a proprietary automated tool to add un-owned domain names during the five day ICANN Add Grace Period. <u>See</u> Jacoby Aff., at ¶ 4. This activity, practiced by Navigation and a number of other companies, is sometimes referred to as "domain tasting." <u>See</u> Jacoby Aff., at ¶ 4, fn. 1. Although Navigation's intent was to identify available dictionary words and generic domain names and typos, automated registration systems do not, on default, differentiate between trademark and other types of domain names. <u>See</u> Jacoby Aff., at ¶ 7.

As a result, Navigation implemented a screening system to identify trademarked domain names during the official five-day Add Grace Period before those names became registered with the applicable registry. <u>See</u> Jacoby Aff., at ¶ 7 (explanation of screening processes). Domain names that matched character-strings on a blacklist, or identified as trademarks by human screeners, were deleted prior to the expiration of the five day Add Grace Period. <u>See</u> Jacoby Aff., at ¶ 7. Potentially infringing domain names were deleted for compliance purposes, not, as Verizon contends, because they did not generate revenue. <u>See</u> Jacoby Aff., at ¶ 13, and Exhibit E to the Jacoby Aff. (showing $350,000 -

$800,000 of potential revenue projected for deleted domain names).

In late 2007, Navigation revamped its screening processes, adding additional compliance personnel and procedures to prevent the registration of potentially trademarked domains. <u>See</u> Jacoby Aff., at ¶ 7. Navigation has since purged its portfolio of tens of thousands domain names identified as being potentially similar to known trademarks. <u>See</u> Jacoby Aff., at ¶ ¶ 10, 13 and Exhibits F, Q to Jacoby Aff. Where there were any matches with identified trademarks, Navigation added the domain names to a blacklist, which bars such domain names from being added again. <u>See</u> Jacoby Aff., at ¶ 10. Although several levels of Navigation employees manually review each domain name selected by its automated systems in an effort to assure that it does not inadvertently register trademarked domain names, some domain names similar to third party trademarks were *registered* – meaning that they were secured for a term of years with the applicable registry, as opposed to being screened for a matter of days and rejected from registration. <u>See</u> Jacoby Aff., at ¶ 11.

Plaintiffs contend that all of the domain names disputed in this action were "**registered**" by, and are currently "**registered**" to, Navigation. <u>See</u> Plaintiffs' Memorandum In Support of Motion for Preliminary Injunction ("Pl. Mem."), at .p. 10. That is not correct. <u>First</u>, a factual issue exists whether domain names reserved during the registry's five day administrative Add Grace Period are *registered* within the meaning of the ACPA. <u>Second</u>, of the 1357 or 1392 domain names allegedly registered by Navigation and held in a "portfolio," only 126 of those are *currently* registered to

Navigation (the "Registered Domain Names"). <u>See</u> Jacoby Aff., at ¶ 16, and Exhibit G attached to Jacoby Aff.[4]

Excluding those names registered out of legal obligation, roughly thirty of the currently registered domain names are misspellings of the word VERIZON plus some other word or phrase. <u>See</u> Jacoby Aff., at ¶ 16, and Exhibit H attached to Jacoby Aff. Those domain names consist largely of badly misspelled words, such as WERIZONVIRALES.COM, WERIZONVIRELES.COM, VERIOSION.COM, VERISONNETWORK.COM, VERVZION.COM, and ZERIZONWIRLESS.COM. <u>See</u> Jacoby Aff., at ¶ 16, and Exhibit H attached to Jacoby Aff. The remainder are variations on Plaintiffs' far less well-known VZ and VZW marks, and of those, many (such as, VZWL.COM, VZW3.COM, VZWPUIX.COM, TEXTVZW.COM, VZNTEXT.COM, VZW22.COM, VZWCHAPERON.COM, VZWHUBS.COM and VZWPLACE.COM) are not readily identifiable with Plaintiffs. <u>See</u> Jacoby Aff., at ¶ 16, and Exhibit I attached to Jacoby Aff.

**D. <u>ACCURACY OF WHOIS INFORMATION</u>**

At all times, Navigation has listed and Basic Fusion has displayed accurate Whois contact information for the disputed Domain Names. <u>See</u> Jacoby Aff., at ¶ 5. Navigation made no effort to hide its identity either behind a fictitious name or a fictitious entity. <u>See</u>

---

[4] Of that number, two domains, (VERISONPICPLACE.COM and MYVZWPIXPLACE.COM) that were in tasting and would have been deleted, were registered after this lawsuit was filed out of a legal obligation not to cancel domain names named in a litigation. <u>See</u> Jacoby Aff., at ¶ 16.

Jacoby Aff., at ¶ 5. Basic Fusion's Whois server is functioning properly, to the best of Basic Fusion's knowledge. <u>See</u> Jacoby Aff., at ¶ 5. Basic Fusion also disputes that it has failed to make Whois information available subsequent to the filing of the Complaint in this action. <u>See</u> Jacoby Aff., at ¶ 5.[5]

### E. <u>NAVIGATION'S POLICY REGARDING TRADEMARK HOLDERS</u>

Navigation has an established company policy of transferring disputed domain names to complaining parties, where justified. <u>See</u> Jacoby Aff., at ¶ 17. When a third party asserts that a domain name registered by Navigation allegedly infringes on its trademark, and the party can establish the ownership of exclusive trademark rights, Navigation's policy is to promptly transfer the domain to the complaining party. <u>See</u> Jacoby Aff., at ¶ 17. Navigation is unaware of any efforts made by Plaintiffs to contact Navigation prior to Plaintiffs' filing of this action. <u>See</u> Jacoby Aff., at ¶ 17.

Navigation's first response after being sued was to disable the advertising links in question. <u>See</u> Jacoby Aff., at ¶ 16, fn. 3. Navigation then transferred the Registered Domain Names to Verizon. <u>See</u> Jacoby Aff., at ¶ 16. Navigation did not attempt to sell any of the domain names in question to Plaintiffs or any other party, and has never attempted to extort money from a trademark holder by selling domain names with a bad faith intent to profit off of a known trademark. <u>See</u> Jacoby Aff., at ¶ 16.

Verizon also contends that Navigation has registered tens or hundreds of thousands

---

[5] It makes no sense that Navigation would make its contact information publicly available for at least four years, only to shield that information *after* having been sued by Verizon.

of domain names containing terms similar to third party trademarks.  See, e.g., Pl.

Complaint, Exhibit 7 (list of 21,133 domains allegedly owned by Navigation).  Although

Navigation did not have enough time to analyze **all** such domain names cited by Verizon

in its various papers, Navigation owns only 1,506 (roughly 7%) of the domains identified

in the Complaint, which domain names Navigation is currently in the process of divesting

from its portfolio. See Jacoby Aff., at ¶ 9, and Exhibit J to the Jacoby Aff.  In other

words, as part of Navigation's standard operating procedures, screeners identified,

deleted and blacklisted roughly 93% or more of the potentially infringing domains on

Plaintiffs' list. See Jacoby Aff., at ¶ 9.  The additional policies stated below should,

nonetheless, cut down substantially on the number of such domain names added or

inadvertently registered.

### F.  **ADDITIONAL SCREENING POLICIES ADOPTED**

Prior to commencement of this action, Navigation was already in the process of

strengthening its screening procedures. See Jacoby Aff., at ¶ 7, and Exhibits A, K to the

Jacoby Aff.  Subsequently, Navigation continued to adopt and implement additional

measures.  See Jacoby Aff., at ¶ 7.  In May and June 2008 Navigation added over 6,000

new character-string terms containing brand names and typos of such brands to the

blacklist, more than quadrupling its size to over 8,500 terms. See Jacoby Aff., at ¶ 12.  In

June 2008 Navigation expects to add at least another 10,000 additional terms to the

blacklist derived from a list of brands that was purchased from a third party, including all

typos and misspellings of such brands. See Jacoby Aff., at ¶ 12. Any domain names matching these criteria will never be registered by Navigation. See Jacoby Aff., at ¶ 12.

Navigation has also enhanced the second phase of the screening process by hiring additional human screeners. See Jacoby Aff., at ¶ 10. Every domain name that is identified by Navigation's automated systems will be screened by humans not once, but twice. See Jacoby Aff., at ¶ 7. Navigation is building a tool to interface with the USPTO database to assist in the identification of potential trademarks. See Jacoby Aff., at ¶ 8. With respect to Navigation's existing domain name portfolio, screeners, in conjunction with the legal department and online tools developed to enhance compliance efforts, are evaluating the entire portfolio for possible trademark issues. See Jacoby Aff., at ¶ 10. Those that are found to be potentially problematic are being deleted. See Jacoby Aff., at ¶ 10.

## G. FILTERING OF VERIZON MARKS

On May 6, 2008, Navigation added the following terms to its blacklist: "fio," "vz," "vzw," "ver," "vir," "zeri," and "eriz." See Jacoby Aff., at ¶ 15. Navigation added "zon" on June 12, 2008. See Jacoby Aff., at ¶ 15. This was done to prevent domain names similar to the following marks: VERIZON, VERIZON WIRELESS, VZ, VZW, VZACCESS, VZEMAIL, VZGLOBAL, VZVOICE, FIOS and VERIZON FIOS trademarks (the "Verizon Marks") from being added or registered. See Jacoby Aff., at ¶ 15.

Plaintiffs contend that, notwithstanding these efforts, some 37 additional domain names, allegedly similar to the Verizon Marks, were registered by Navigation after receipt of the Complaint. <u>See</u> Bradley Decl., ¶ 8. Only **one** of the 37 domains, vzwwireles.com, was actually *registered* by Navigation after receipt of the Complaint. That domain name was registered on May 3, 2008, three days before the terms "vz" and "vzw" were added to Navigation's blacklist.[6] <u>See</u> Jacoby Aff., at ¶ 14. The remaining domain names were screened and deleted by Navigation's human screeners during the Add Grace Period. <u>See</u> Jacoby Aff., at ¶ 14, and Exhibit L to Jacoby Aff. Moreover, the domain names tasted after May 6, 2008 bear little resemblance to the Verizon Marks. It is difficult to see how domain names, such as varzzon.com, vorizonwilless.com, varizonweriless.com, vreionswireless.com, vrrlzonwireless.com, varizonnet.com, vceraiz0nwireless.com, vsrzionwireless.com, startvorizon.net or varizoninternet.com, could be confused with the Verizon Marks. Although each of these domain names was identified by human screeners and deleted prior to registration, it is difficult to see how Navigation could have anticipated and blacklisted the particular misspellings complained of by Verizon.[7]

In all, Navigation and Basic Fusion are not the cyber-pirates that Verizon makes

---

[6] Four of the 37 domain names (wirelessvirizon.com, verizopn.net, veriso.net, verizionwareless.com) were registered to customers of Basic Fusion and not Navigation. <u>See</u> Jacoby Aff., at ¶ 14, and Exhibits L, M, N, O, P to Jacoby Aff.

[7] It is difficult to believe that these domains were organically generated by actual customers. They go far beyond a simple typo or misspelling. Verizon may be using its own DNS wildcarding technology to generate additional typos to test Navigation's systems, which typos were then added by Navigation via its automated tool.

them out to be.  Although Navigation's record has not been perfect, it has made good faith efforts to help ensure that trademarks of third parties are respected.  Legitimate claims made regarding allegedly infringing domain names have been promptly addressed and remedied.  Additional filters and compliance processes have been implemented.

**III.  LEGAL ARGUMENT**

   **A. INTRODUCTION**

     **1.  Standard For Granting Injunctive Relief**

       Injunctive relief is a drastic remedy that should only be granted in extreme circumstances.  See Sampson v. Murray, 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); RasterOps v. Radius, Inc., 861 F. Supp. 1479, 1482 (N.D. Cal. 1994).  The Court may not exercise its discretion to grant a preliminary injunction unless Plaintiffs establish (1) a likelihood of success on the merits of both their case in chief and against Navigation's affirmative defenses, and a showing of irreparable injury or (2) serious questions going to the merits where the balance of hardships tip sharply in Plaintiffs' favor. Sony v. Connectix, 53 U.S.P.Q.2d 1705, 1709 (9th Cir. 2000).  The burden on the party seeking a preliminary injunction is heavier in cases such as this one where the grant of injunctive relief would effectively grant the Plaintiffs much of the relief available only after a full trial on the merits. 5 J. Thomas McCarthy, Trademarks and Unfair Competition § 30.30, at 30-70 (4th ed. 2006) (citation omitted).

       Although Plaintiffs rely heavily on the presumption of irreparable harm, that presumption can be rebutted where "the plaintiff has not been harmed, [or] where any harm is de minimis." Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 829 (9th

Cir. 1997). In this case, Navigation transferred all of the Registered Domain Names voluntarily to Plaintiffs. Navigation has implemented a Verizon blacklist and has bolstered its screening procedures. No new Verizon domain names have been *registered* since the blacklist was implemented on May 6, 2008. In addition, Verizon waited more than a month after filing its Complaint, and for *at least* fifteen months after it had knowledge of Navigation's alleged conduct (and likely longer), before moving for a preliminary injunction. As such, Verizon would not be irreparably injured by this Court's denial of its motion for a preliminary injunction and Verizon would still be able to obtain any necessary relief after a full trial on the merits. On the other hand, a grant of the injunctive relief requested, barring Navigation from registering domain names using an automated process, would cripple Navigation's business.

## B. PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM

### 1. Plaintiffs Unreasonably Delayed in Seeking Injunctive Relief

Plaintiffs cannot show irreparable harm where they have delayed in moving for injunctive relief for a period of more than a year, undermining any presumption of irreparable injury they may have otherwise enjoyed. See e.g. eAcceleration Corp. v. Trend Micro, Inc., 408 F. Supp. 2d 1110, 1122 (W.D. Wash. 2006) (delay of one year contradicted plaintiff's assertion of "urgent, continuing and irreparable harm."). As noted by Professor McCarthy, the failure of a plaintiff to act with due speed undercuts the need for emergency relief:

> A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy relief and cannot complain of the delay

involved pending any final relief to which it may be entitled after a trial on all the issues.

McCarthy, supra, § 30:53, at 30-122 (quoting Helena Rubenstein, Inc. v. Frances Denney, Inc., 286 F. Supp. 132 (S.D.N.Y. 1968)).

Plaintiffs have not alleged when they first became aware of Navigation's registration of certain domain names and adding of others.  The reason for this omission is that Plaintiffs have known of Navigation's actions for well over a year – March 2007, at the latest.  By that time, Plaintiffs had filed three lawsuits against third parties over allegedly infringing domain name registrations, and had access to sophisticated domain name monitoring equipment.[8]  It is inconceivable that they simply overlooked Navigation, which had added, dropped, and, in some cases, registered Verizon formative domain names since at least as early as 2004. See Jacoby Aff., at ¶ 2.  Moreover, Plaintiffs did not file their motion for a preliminary injunction until June 9, 2008, roughly fifteen months later.

Nor do Plaintiffs offer any evidence of actual harm in their motion and supporting papers.  Plaintiffs rely, instead, on a bare assumption of irreparable harm.  This failure of proof, coupled with Plaintiffs' extensive delays in seeking injunctive relief, utterly belies the assertion that Plaintiffs would suffer an irreparable injury if the requested relief is not granted. See Valeo Intellectual Property, Inc. v. Data Depth Corp., 368 F. Supp. 2d 1121,

---

[8] See generally Verizon California Inc. et al. v. Ultra RPM Inc., CV 07-2587 (C.D. Cal.) (filed Apr. 18, 2007);  Verizon North Inc. et al. v. Internet Reit Inc., CV 07- 996  (S.D. Tex.) (filed Mar. 23, 2007), and Verizon California Inc. et al. v. Maltuzi LLC et al., CV 07- 1732  (C.D. Cal.) (filed Mar. 15, 2007).

1128 (W.D. Wash. 2005) ("A three-month delay in seeking injunctive relief is inconsistent

with [the movant's] insistence that it faces irreparable harm." (citations omitted));

Citibank, N.A. v. Citytrust, 756 F.2d 273, 276-77 (2d Cir. 1985) (plaintiff's delay of

more than nine months proved no irreparable harm; granting motion would have been

abuse of discretion); Majorica, S.A. v. R.H. Macy & Co., Inc., 762 F.2d 7, 8 (2d Cir.

1985) (seven month delay is evidence of lack of irreparable harm).[9]

In sum, Plaintiffs' delay of at least fifteen months or more in seeking emergency

injunctive relief, and the complete lack of evidence of any harm to Plaintiffs should their

motion be denied, undercut all urgency alleged by Plaintiffs.   This is a matter that can be,

and should be, decided on the merits after discovery and a full trial.

### 2.  Defendants Have Already Discontinued the Allegedly Infringing Activities

In addition, as stated above, Navigation has ceased to register domain names that

are similar to the Verizon Marks.  Navigation has enhanced its compliance procedures,

implemented a blacklist not only of Verizon trademarks, but also of top brands and typos

---

[9] Courts have also consistently rejected damages claims made by plaintiffs that sit back, fail to act, and let damages accrue. See, e.g., Grotrian, Helfferich, Shultz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1344 (2d Cir. 1975) (denying claim for damages where plaintiff failed timely to assert its rights); accord Skippy, Inc. v. CPC Int'l, Inc., 674 F.2d 209, 212-13 (4th Cir. 1982); see also Nordic Inn Condominium Owners' Ass'n v. Ventullo, 151 N.H. 571, 583, 864 A.2d 1079, 1090 (N.H. 2004) (ACPA case holding that plaintiff's "delay in seeking damages undercuts its claim that past profits generated by the defendants were due to actual public confusion.") (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:11, at 31-38 (4th ed. 2004)).  In this case, it would be inequitable to award Verizon damages for any domain name registered after Verizon first learned of the disputed conduct.

of those brands. <u>See</u> Jacoby Aff., at ¶ 7.  Navigation now screens all pre-registered domain names with two human screeners prior to registering any domain names. <u>See</u> Jacoby Aff., at ¶ 7.  Navigation also voluntarily transferred all of the Registered Domain Names to Verizon immediately after being served with the Complaint. <u>See</u> Jacoby Aff., at ¶ 16.

Notwithstanding the above, Verizon maintains that it will be irreparably harmed by Navigation's adding and dropping of a small number of domain names allegedly containing fringe misspellings of Verizon's Marks (e.g., varzzon.com, vreionswireless.com, veerisonwireless.com, and vorizonwilless.com).  The domain names in question contain so many spelling errors – and are so unlikely to be typed in by users – that it is difficult to conceive of exactly what harm Verizon would suffer from their addition and deletion during the Add Grace Period.

Indeed, even if these badly misspelled domain names were never tasted, given Verizon's DNS wildcarding practices and the wildcarding practices of other ISPs, these typos would resolve to a page of advertised links. <u>See</u> Exhibits N, O, P, Q to Johnson Decl.  It makes absolutely **<u>no difference</u>** whether these terms are tasted by Navigation or not.  In 2008, virtually every typographical error and misspelling of a word is monetized by someone, whether a domain name registrar, a domain investor, an ISP, or Verizon itself. <u>See</u> Exhibits A - Q to Johnson Decl.

As Plaintiffs have not and cannot establish irreparable harm, their motion should be denied.

## C. **PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IS BARRED BY THEIR UNCLEAN HANDS**

The Ninth Circuit has held that "[u]nclean hands is a defense to a Lanham Act infringement suit." Japan Telecom, Inc. v. Japan Telecom America Inc., 287 F.3d 866, 870 (9th Cir. 2002) (citations omitted). Courts have found that "[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, *or that the manner of dirtying renders inequitable the assertion of such rights against the defendant*." Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347, 349 (C.A.Cal. 1963) (emphasis added). A court will bar an action for unclean hands, when a defendant shows some relationship between the right asserted and the wrong complained of. See, e.g., 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:51 (4th ed. 2002).

Courts have applied the unclean hands doctrine, as a doctrine of "misuse" in the context of Intellectual Property, in general, (see, e.g., In re Napster Copyright Litigation, 191 F.Supp.2d 1087, 1102-06 (N.D. Cal. 2002)), and trademark misuse, in particular. See, e.g., Phi Delta Theta Fraternity v. J.A. Buchroeder & Co., 251 F.Supp. 968, 977-80 (D.C.Mo. 1966) (Unclean hands to attempt to obtain monopoly over fraternity insignia through application of trademark law); see also Bambu Sales, Inc. v. Testini, 1988 WL 138055 at *5, 12 U.S.P.Q.2d 1479 (E.D.N.Y. 1988) (consideration of unclean hands appropriate where plaintiff sought damages under Lanham Act based upon lost illegal sales); see generally RESTATEMENT (THIRD) UNFAIR COMPETITION, §32, *comment d.*

(trademark misuse may give rise to unclean hands); cf. Ames Publishing Co. et al. v. Walker-Davis Publications, Inc., et al., 372 F.Supp. 1, 14-15 (D.C. Pa. 1974) (enjoining both plaintiff and defendant from the same acts under Lanham Act (citing Republic Molding Corp. v. B.W. Photo Utilities, 319 F.2d 347 (9th Cir. 1963)).

At the heart of this public policy approach is that it seeks to stop the holder of a limited right in intellectual property from abusively asserting that right to expand its statutory monopoly "in order to gain control over areas outside the scope of the monopoly." In re Napster Copyright Litigation, 191 F.Supp.2d 1087, 1103 (N.D. Cal. 2002) (citing Practice Mgmt. Info. Corp. v. American Med. Assoc., 121 F.3d 516 (9th Cir. 1997)); cf. Lasercomb America Inc. v. Reynolds, 911 F.2d 970, 977-79 (4th Cir. 1990) (reversing District Court where it had "declin[ed] to recognize a misuse of copyright defense").

In this case, Verizon is misusing its trademark rights to bar Navigation from making *any* automated registration of domain names, on the basis that a subset of domain names registered by Navigation are similar to Verizon's trademarks. See Complaint p. 35, ¶ 3(b). Verizon lacks standing to ask the Court for such broad relief. See, e.g., CPC International, Inc. v. Skippy Incorporated, 214 F.3d 456, 459 (4th Cir. 2000) (overruling a district court's "sweeping injunction" that prohibited the appellant from engaging in permissible speech on its website); Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd., 627 F.2d 628 (2d Cir. 1980) (limiting injunctive relief when the equities of the case are closely balanced); Feathercombs, Inc. v. Solo Products Corp., 306 F.2d 251, 258 (2d

Cir. 1962), cert. denied 371 U.S. 910 (1962) (holding that injunctive relief should not go so far as to prohibit a competitor from "legitimately market[ing] its own" products).

In this case, there is more than a sufficient evidentiary basis to support a finding of trademark abuse. Verizon chastises Navigation for not successfully blocking trademark typos from being registered, but makes **no** effort, itself, to screen or block out any trademarks from returning results in its money-making DNS wildcarding scheme. Verizon is picking off the competition, one by one, by leveraging its trademark rights to expand its business into the typo monetization field. <u>See</u> <u>generally</u> Exhibits A - Q to Johnson Decl.

Verizon started filing lawsuits in March 2007, just three months before it rolled out its DNS wildcarding service in June 2007. With its success in shutting down the competition, Verizon, upon information and belief, has expanded its typo traffic business and the money it makes from such operations. Verizon monetizes typo traffic through Yahoo!, the same service used by Navigation, and makes no effort to filter out trademarks, despite claims that blocking trademark typos is easy to do. Accordingly, for the foregoing reasons, Verizon's request for injunctive relief should be denied.

## D. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CYBERSQUATTING CLAIM

### 1. Introduction

Verizon's papers are misleading on the issue of bad faith registration and use. As

stated above, Verizon omitted any mention in its papers of the significant difference

between so-called *tasted* domain names and *registered* domain names.[10] The differences

in this case, however, are as great as the gap between good and bad faith. With respect to

tasted domain names, two novel issues arise: (1) does the reservation of a domain name

without payment of any registry fee for a period of five days or less constitute

"registration," within the meaning of the ACPA; and, if so, (2) does a parties' deletion of

a tasted domain name based on trademark compliance purposes during the five day

ICANN Add Grace Period constitute a bad faith *use* of such domain names. No reported

decision that we could find has resolved this issue.

## 2. Tasting Does not Constitute Registration

At the time of the enactment of the ACPA on November 29, 1999, there was no

Add Grace Period. See Exhibit R to Johnson Decl. (Add Grace Period for ".com" enacted

on May 25, 2001). As such, the practices in dispute in this litigation did not exist and

could not have been within the contemplation of Congress. Verizon, nonetheless,

conclusorily argues that tasted domain names are *registered* within the meaning of the

ACPA.

ICANN's Registrar Accreditation Agreement (the "Agreement") is instructive in

this regard. That Agreement provides that:

Registrar shall not activate any Registered Name unless and until it is satisfied that

---

[10] Arguments not refuted herein are not admitted. The arguments addressed in these
papers, however, are believed to be the most relevant to the Court's determination.

> it has received a reasonable assurance of payment of its registration fee.  For this purpose, a charge to a credit card, general commercial terms extended to creditworthy customers, or other mechanism providing a similar level of assurance of payment shall be sufficient, provided that the obligation to pay becomes final and non-revocable by the Registered Name Holder upon activation of the registration.

See Agreement, § 3.7.4, attached as Exhibit S to Johnson Decl.  This provision expressly states that a registration may not be activated until payment becomes final and non-revocable.  In the case of domain names that are tasted, no payment is made or assured. The transaction can be canceled at any time without payment, prior to the expiration of the five-day Add Grace Period.  Thus, tasted domain names are not *registered,* within the meaning of ICANN's controlling Agreement or the ACPA.

### 3.  Navigation Did Not Use the Tasted Domains in Bad Faith

"A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation." Interstellar Starship Services, LTD v. EPIX, Inc., 304  F.3d 936, 946 (9th Cir. 2002) (good faith where defendant performed web search to avoid registering trademark).   Of the alleged 1300 plus infringing domain names in dispute in this action, all but 126 of them were screened for compliance and deleted by Navigation prior to this action. See Jacoby Aff. ¶ 16, and Exhibit G to the Jacoby Aff.  When you fish for tuna, you occasionally catch a dolphin, and you throw it back.  Navigation caught a few dolphins, but threw back over 90%, in the case of Verizon.  Of the remaining 126 domain names, the great majority of them are scarcely recognizable as bearing any relation to the VZ and VZW marks.  These domain names include: VZWL.COM, VZW3.COM,

VZWPUIX.COM, TEXTVZW.COM, VZNTEXT.COM, VZW22.COM, VZWCHAPERON.COM, VZWHUBS.COM and VZWPLACE.COM. See Exhibit I attached to Jacoby Aff.

Of the remainder, fewer than twenty-five of the currently registered domain names are misspellings of the word VERIZON plus some other word or phrase. See Exhibit H attached to Jacoby Aff. Such domain names include: WERIZONVIRALES.COM, WERIZONVIRELES.COM, VERIOSION.COM, VERISONNETWORK.COM, VERVZION.COM, and ZERIZONWIRLESS.COM. See Exhibit H attached to Jacoby Aff.

In all, a small percentage of the domain names in dispute, and a tiny fraction of the domain names registered by Navigation overall, raise potential trademark concerns for Verizon. In addition, the vast majority of the third party trademark domains allegedly registered by Navigation and cited in the Complaint (19,607 out of 21,113) were screened and deleted in accordance with Navigation's compliance practices. See Jacoby Aff., at ¶ 9. Navigation is currently in the process of divesting its portfolio of those remaining domain names that were not yet deleted. See Jacoby Aff., at ¶ 9.

With respect to the more than 90% or so of the domain names tasted and/or deleted by Navigation and at issue here, Navigation's *use* of those domain names was not in bad faith. Navigation freed the dolphins caught in its nets. Unlike several of the other entities that Verizon has sued, Navigation did not engage in a practice of perpetually adding and dropping tasted domain names to collect advertising fees, while avoiding

registration costs – so-called domain name *kiting*. See Jacoby Aff., at ¶ 6. Instead, Navigation added identified trademark typos to a blacklist, not to be registered again. See Jacoby Aff., at ¶ 7.

As stated above, even before this litigation was filed, Navigation had undertaken an internal compliance review process and had retained outside counsel to advise it on ways to improve its standard operating procedures. See Jacoby Aff., at ¶ 7. Several steps had been adopted prior to the commencement of this litigation, and others have been adopted in response to it, to provide additional safeguards against registering domain names that are similar to known trademarks. See Jacoby Aff., at ¶¶ 7, 10.

Given the entirety of the record before this Court, we respectfully submit that Verizon has not established a likelihood that it will succeed on the merits of its ACPA claims.

**E. THE SCOPE OF THE REQUESTED RELIEF IS VAGUE AND OVERBROAD**

Plaintiffs' demand that Defendants stop using an automated process to register domain names is vague and overbroad. Most registration functions performed by Basic Fusion for its customers, including, Navigation, are automated. Were the requested injunction granted, it would stop Navigation's entire business. See Jacoby Aff., at ¶ 17. Staff layoffs would follow. See Jacoby Aff., at ¶ 17.

The relief requested is also far broader than whatever relief Verizon has standing to seek under the law. Again, it seems that Verizon's principal motive in bringing these

24

actions is a competitive one – stop the competition from using automated systems to identify domain names that generate Web traffic, so more typo traffic will be diverted to Verizon's competing wildcard DNS scheme.  So far, Verizon's plan to use its trademark rights to gain an unfair advantage in the typo monetization field is working.   We respectfully request that this Court give a hard look at Verizon's practices before granting Verizon any more unwarranted relief.

## IV.  <u>CONCLUSION</u>

Given the serious and novel issues that deserve to be litigated with more attention than can be mustered on an expedited motion for a preliminary injunction, the harm to Defendants of shutting down its automated systems, and the absence of any real harm to Verizon in denying its motion, we respectfully request that Verizon's motion be denied.


DATED:  June 16, 2008

Respectfully Submitted,

LEWIS & HAND, LLP

By /s/ Brett E. Lewis _____

Attorneys for Defendants,
NAVIGATION CATALYST SYSTEMS, INC.; and BASIC FUSION, INC.