**DAVID J. STEELE, CA Bar No. 209797**
**Email: david.steele@cph.com**
**CHRISTIE, PARKER & HALE, LLP**
**3501 Jamboree Road, Suite 6000-North Tower**
**Newport Beach, CA 92660**
**Telephone: (949) 476-0757**
**Facsimile: (949) 476-8640**

**HOWARD A. KROLL, CA Bar No. 100981**
**Email: howard.kroll@cph.com**
**CHRISTIE, PARKER & HALE, LLP**
**350 W. Colorado Boulevard, Suite 500**
**Pasadena, CA 91105**
**Telephone: (626) 795-9900**
**Facsimile: (626) 577-8800**

**JOHN THORNE (Admitted *pro hac vice*)**
**Email: john.thorne@verizon.com**
**VERIZON CORPORATE SERVICES GROUP INC.**
**SARAH B. DEUTSCH (Admitted *pro hac vice*)**
**Email: sarah.b.deutsch@verizon.com**
**VERIZON CORPORATE SERVICES CORP.**
**1515 North Court House Road, Suite 500**
**Arlington, VA 22201**
**Telephone: (703) 351-3044**
**Facsimile: (703) 351-3670**

Attorneys for Plaintiffs
VERIZON CALIFORNIA INC.
VERIZON TRADEMARK SERVICES LLC
VERIZON LICENSING COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| VERIZON CALIFORNIA INC.; VERIZON TRADEMARK SERVICES LLC; and VERIZON LICENSING COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> NAVIGATION CATALYST SYSTEMS, INC.; and BASIC FUSION, INC., <br><br> Defendants. <br><br> ———————————————— <br> AND RELATED COUNTERCLAIMS. | Case No. CV 08-02463 ABC (Ex) <br><br> **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **DATE:** June 30, 2008 <br> **TIME:** 10:00 a.m. <br> **CTRM:** 680 <br><br> **HON. AUDREY B. COLLINS** |

# **TABLE OF CONTENTS**

**PAGE(S)**

I.     INTRODUCTION ................................................................................ - 1 -

II.    PLAINTIFFS WILL SUCCEED ON THEIR ACPA CLAIMS ............... - 2 -

   A.    DEFENDANTS REGISTERED AND USED CONFUSINGLY

        SIMILAR DOMAIN NAMES ........................................................ - 2 -

      1.    Defendants' Registration of Domain Names During the "Add Grace

          Period" is a Registration Under the ACPA ...................................... - 2 -

      2.    Defendants' Use of Domain Names in Bad Faith Independently

          Satisfies the ACPA Requirement ..................................................... - 5 -

      3.    The Domain Names Registered by Defendants Are Confusingly

          Similar to Plaintiffs' Marks .............................................................. - 6 -

   B.    DEFENDANTS REGISTERED AND USED DOMAIN NAMES WITH

        A BAD FAITH INTENT TO PROFIT ................................................ - 7 -

      1.    Defendants Intended to Divert Customers from Plaintiffs .............. - 8 -

      2.    Defendants Failed to Provide Accurate WHOIS Data .................. - 10 -

      3.    Defendants Registered Multiple Domain Names Which They Knew

          Were Confusingly Similar to Marks of Others .............................. - 11 -

III.   PLAINTIFFS ARE BEING IRREPARABLY HARMED .................... - 14 -

IV.   plaintiffs' ADVANCED SEARCH SERVICE IS LEGAL AND DOES

      NOT SUPPORT THE DEFENSE OF UNCLEAN HANDS ................ - 16 -

V.    THE PROPOSED INJUNCTION IS NOT VAGUE

      OR OVERBROAD .............................................................................. - 18 -

VI.   CONCLUSION ................................................................................. - 18 -

CHRISTIE, PARKER & HALE, LLP

# TABLE OF AUTHORITIES

## CASES

*Advance Magazine Publishers, Inc. v. Gogue International*,
123 F. Supp. 2d 790 (D. N.J. 2000) ........................................................... 14

*Audi AG v. D'Amato*,
381 F. Supp. 2d 644 (E.D. Mich. 2005) *affirmed* 469 F. 3d 534,
551 (6th Cir. 2006) ....................................................................................... 4

*DaimlerChrysler v. The Net Inc.*,
388 F.3d 201 (6th Cir. 2004) ..................................................................... 14

*Fitzgerald Public Co., Inc. v. Baylor Public Co., Inc.*,
807 F.2d 1110 (2nd Cir. 1986) .................................................................... 8

*Flow Control Industrial, Inc. v. AMHI, Inc.*,
278 F. Supp. 2d 1193 (W.D. Wash. 2003) ............................................... 16

*Ford Motor Company v. Greatdomains.com, Inc.*,
177 F. Supp. 2d 635 (E.D. Mich. 2001) ..................................................... 7

*Goto.com, Inc. v. The Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) ................................................................... 16

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
211 F. Supp. 2d 567 (E.D. Pa. 2002) .......................................................... 8

*Lucas Nursery and Landscaping, Inc. v. Grosse*,
359 F.3d 806 (6th Cir. 2004) ....................................................................... 6

*MAI Systems Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) ..................................................................... 14

*NCR Corp. v. ATM Exch., Inc.*,
81 U.S.P.Q. 2d 1216 (D. Ohio 2006) ........................................................ 13

*N. Light Tech., Inc. v. N. Lights Club*,
236 F.3d 57 (1st Cir. 2001) .......................................................................... 6

*Ocean Garden, Inc. v. Maktrade Co.*,
953 F.2d 500 (9th Cir. 1991) ............................................................... 15, 16

*PETA v. Doughney*,
113 F. Supp. 2d 915 (E.D. Va. 2000)
*aff'd*, 263 F.3d 359 (4th Cir. 2001) .......................................................... 17

*Republic Molding Corp. v. B.W. Photo Utilities*,
319 F.2d 347 (9th Cir. 1963) ..................................................................... 17

*Shields v. Zuccarini*,
89 F. Supp. 2d 634 (E.D. Pa. 2000) .......................................................... 14

CHRISTIE, PARKER & HALE, LLP

*Shields v. Zuccarini*,
    254 F.3d 476 (3rd Cir. 2001) ............................................................7, 12, 13

*The Neiman Marcus Group, Inc. et al. v. Ultra RPM Inc.*
    CV 07-2587 PA (CWx)(C.D. Cal) ............................................................4, 7

*Verizon California Inc. et. al. v. Maltuzi LLC et. al.*
    CV 07-1732 PA (JCx) (C.D. Cal) ............................................................7, 12

*Verizon California Inc. et. al. v. Ultra RPM Inc.*
    CV 07-2585 PA (CWx) (C.D. Cal) ............................................................4

*Vision Sports, Inc. v. Melville Corp.*,
    888 F.2d 609 (9th Cir. 1989) ............................................................14

## STATUTES

15 U.S.C. § 1125(d) ............................................................2, 5, 7, 8, 10, 11, 12

15 U.S.C. §1127 ............................................................16

## OTHER

S. Rep. 106-140 at 1-2 ............................................................13

CHRISTIE, PARKER & HALE, LLP

## I.  **INTRODUCTION**

Defendants must be enjoined because they cannot stop cybersquatting -- even after notice of their illegal activities.  After the Complaint was served on Defendants and before Plaintiffs filed their Motion for Preliminary Injunction (between April 23, 2008 and June 9, 2008), Defendants continued to register at least thirty-seven domain names which were confusingly similar to Plaintiffs' Marks and over 1,500 domain names which were confusingly similar to the famous marks identified in the Complaint.[1]    [Declaration of Anne F. Bradley Filed In Support Of Motion ("Bradley Dec.") ¶¶8, 9.]

Defendants still have not stopped cybersquatting.  Despite a Complaint and Motion for Preliminary Injunction filed against them, Defendants continue to register and use domain names that are confusingly similar to famous marks, including Plaintiffs' Marks.  For example, on June 11, 2008, **two days after** the Motion for Preliminary Injunction was served, Defendant registered and used *vorizonwiorless.com*, which is confusingly similar to Plaintiffs' Marks.[2] [Declaration of David J. Steele Filed In Support Of Reply ("Steele Dec."), ¶3.  In addition, since June 9, 2008, Defendants have registered and used at least 250 domain names that are confusingly similar to the other famous marks identified in the Complaint, including *abercomberandificth.com, banko9faamerica.com, cingarlur.com, disniechannl.com, disnischannel.com, fiisher-price.com, jcpoenneys.com, louisvuttionbackground.com, nasccarrandd.com, pokemmoncheats.com, walmhart.com, yahho0o.net* etc. [Steele Dec., ¶12] .

---

[1]  Before the Complaint was filed on April 16, 2008, Defendant had registered and used over 1,300 domain names that were confusingly similar to the Plaintiffs' Marks and at least 15,000 domain names that were confusingly similar to other famous marks.  [Bradley Dec., ¶¶2, 3, Exhibits B and C to Bradley Dec.].

[2]  Exemplifying just how confusingly similar the domain name *vorizonwiorless.com* is to Plaintiffs' Marks, the Google.com search engine returns the following to a search for *vorizonwiorless.com*.  "Do you mean *verizonwireless.com*?" [ Steele Dec., ¶9 and Exhibit K to Steele Dec.]

CHRISTIE, PARKER & HALE, LLP

Whether Defendants are unwilling or unable, because they use an automated process, to stop their cybersquatting activities, the Court must enjoin Defendants from registering, using or trafficking in domain names that are confusingly similar to the Plaintiffs' Marks. In addition, given Defendants' use of an automated process that is known to result in the registration of infringing domain names, and which continues to register infringing domain names, the Court must enjoin Defendants from using such an automated process.[3]

In their Opposition, Defendants seek to minimize, if not immunize, their actions by claiming that Plaintiffs have unclean hands. Without any legal or factual support, Defendants claim that Plaintiffs' Advanced Search Service, sometimes referred to as a DNS wildcarding system, is unlawful even though it is triggered only when a user types into their Internet browser a domain name that has not been registered. Since the ACPA applies only to the registration, use or trafficking in of **registered domain names,** Plaintiffs' Advanced Search Service is legal and cannot support Defendants' unclean hands defense.

## II.  PLAINTIFFS WILL SUCCEED ON THEIR ACPA CLAIMS

The evidence forcefully shows that Defendants are cybersquatters because they (1) registered, used or trafficked in, a domain name (2) that is identical or confusingly similar to a distinctive or famous trademark, (3) with a bad faith intent to profit from the mark. *See* 15 U.S.C. § 1125(d).

### A.  DEFENDANTS REGISTERED AND USED CONFUSINGLY SIMILAR DOMAIN NAMES

#### 1.  Defendants' Registration of Domain Names During the "Add Grace Period" is a Registration Under the ACPA

Defendants claim, in their Opposition, that they are not liable under the

---

[3]  Defendants should be enjoined from using their automated process until they can demonstrate to the Court that use of the automated process will not result in the registration of any domain names that are confusingly similar to famous or distinctive marks, including the Plaintiffs' Marks.

CHRISTIE, PARKER & HALE, LLP

ACPA because they never "registered" domain names. Defendants contend that the registration and then deletion of domain names during the five-day "Add Grace Period" is not a registration under the ACPA.[4] [Opposition, pp. 7-8, 21-22]. Defendants are mistaken. The policy outlined by ICANN and the cases analyzing this question each indicate that registration during the "Add Grace Period" is a registration within the meaning of the ACPA.

The governing ICANN agreement unambiguously states: "The *Add Grace Period* is a specified number of calendar days following the initial **registration** of a domain." [Section 3.1.1 of Appendix 7 to the .COM Agreement between ICANN and VeriSign attached as Exhibit M to the Steele Dec.] (emphasis added). Despite this language, Defendants persist in mischaracterizing their registration of millions of domain names during the Add Grace Period as being "reserved" and not "registered." [Opposition, p. 7.] This mischaracterization also ignores the reality that these so-called "reservations" give Defendants the exact same rights that registration typically confers. For example, during the Add Grace Period, Defendants had exclusive control and use of those domain names and the right to extend that control and use as long as they choose to the exclusion of all others. [Steele Dec. ¶15.]

Furthermore, in a similar case brought in this District by Verizon against another cybersquatter, Judge Percy Anderson held that the five-day "Add Grace Period" ***does not*** immunize a registrant from violations of the ACPA:

> Indeed, Defendant effectively treats the five-day "Add Grace Period" available under ICANN as a five-day safe harbor in which it is able to infringe Plaintiffs' marks until the newly registered domain names have

---

[4] It should be noted that Defendants admit that, even beyond the Add Grace Period, they registered 126 domain names that were confusingly similar to Plaintiffs' Marks. [Opposition, p. 22.]

been "trademark scrubbed" and potentially infringing domain names have been cancelled. Defendant has provided no authority in support of its suggestion that the "Add Grace Period" available under ICANN preempts the ACPA. ***Nothing in the ACPA suggests that confusingly similar domain names may be registered in the first instance as long as they are cancelled within five days.***

*Verizon California Inc. et. al. v. Ultra RPM Inc.,* CV 07-2587 PA (CWx)(C.D. Cal), Minute Order of September 10, 2007 at p. 7. (emphasis added). *See also The Neiman Marcus Group, Inc. et al. v. Ultra RPM Inc.,* CV 07-2585 PA (CWx) (C.D. Cal), Minute Order of September 10, 2007 at p. 7 ("Absent statutory language or other persuasive authority, the Court, at least at this stage, will not construe the ICANN 'Add Grace Period' as an additional exception to the ACPA"). Copies of these Orders are attached as Exhibit N and O to Declaration of Steele.

Therefore, and contrary to Defendants' strained interpretation of the ACPA, the registration of a domain name during the "Add Grace Period" is a registration within the meaning of the ACPA.[5] Consequently, Defendants had registered at least 1392 domain names[6] that are confusingly similar to Plaintiffs'

---

[5] The fact that Defendants held these confusingly similar domain names for five days or less is of little import. *See Audi AG v. D'Amato,* 381 F. Supp. 2d 644, 656 (E.D. Mich. 2005) ("The Lanham Act and the ACPA do not require that an infringing or bad faith use persist for any particular duration") *affirmed* 469 F. 3d 534, 551 (6th Cir. 2006). Under the ACPA, liability arises "upon the mere registration if done in bad faith." *Id.*

[6] Defendants claim, without any support, that only the 126 domain names "currently registered to Navigation" are relevant, rather than the 1392 domain names Plaintiffs allege were previously registered. [Opposition, pp. 7-8.] The ACPA, however, does not limit liability only to those domain names that are currently registered.

CHRISTIE, PARKER & HALE, LLP

Marks by the time Plaintiffs' filed this Motion. [Bradley Dec., ¶2 and Exhibit B to Bradley Dec.]

### 2. Defendants' Use of Domain Names in Bad Faith Independently Satisfies the ACPA Requirement

The ACPA makes liable one who "registers, traffics in, *or* uses a domain name," provided the other requirements, such as "bad faith," are met. 15 U.S.C. § 1125(d)(1)(A)(ii) (emphasis added). Therefore, even if Defendants' exclusive and irrevocable "reservation" of domain names during the "Add Grace Period" is found not to constitute registration under the ACPA, Defendants are still liable because of their "use" of confusingly similar domain names.

Defendants do not dispute that they "used" confusingly similar domain names during the five-day "Add Grace Period,"[7] nor could they. Defendants hosted websites at those domain names that displayed links featuring goods or services that are directly competitive with those sold or provided by Plaintiffs. [Bradley Dec. ¶4 and Exhibit D to Bradley Dec.]

Defendants "use" of confusingly similar domain names during the five-day "Add Grace Period" has continued, unabated, even after it was served with the Motion for Preliminary Injunction. For example, on June 11, 2008, Defendants registered the domain name *vorizonwiorless.com*. On June 12, 2008, the website accessible at that domain name displayed links to "Cell Phone Deals" and "Cellular Accessories." As of the filing of this Reply, the domain name is unregistered, indicating that the registration was deleted by Defendants before the end of the "Add Grace Period." [Steele Dec., ¶¶ 10 and 11, Exhibit L to Steele Dec.] Thus, even though Defendants deleted confusingly similar domain names

/ / /

---

[7] Defendants incorrectly prefer to ask: does the "deletion of a domain name based on trademark compliance purposes . . . constitute a bad faith use?" [Opposition, p.21.] However, Plaintiffs' Complaint is directed at the use of the domain name to host a website **prior to its deletion**.

CHRISTIE, PARKER & HALE, LLP

within the "Add Grace Period," Defendants "used" those domain names by hosting commercial (and competitive) websites prior to their deletion.

### 3. The Domain Names Registered by Defendants Are Confusingly Similar to Plaintiffs' Marks

Defendants do not dispute that the VERIZON Marks are famous or that the VERIZON FIOS Marks and the VZW Marks are distinctive. Surprisingly, Defendants do appear to dispute the confusing similarity of the domain names by wrongly characterizing several of the Infringing Domain Names as "badly misspelled words" or "not readily identifiable with Plaintiffs." [Opposition, p. 8.] Defendants are mistaken.

First, Defendants acknowledge that deleting over 1200 domain names during the five-day "Add Grace Period" is part of their screening process. [Opposition, p. 22.] Defendants thus admit that these domain names were confusingly similar to Plaintiffs' Marks. It is also obvious, in an objective comparison of Defendants' domain names to Plaintiffs' Marks, that the domain names are confusingly similar. *See N. Light Tech., Inc. v. N. Lights Club,* 236 F.3d 57, 66 n. 14 (1st Cir. 2001) (appropriate to compare the "facial similarity" of the domain name to the mark).

Second, many of the websites hosted by Defendants on the over 1,300 Infringing Domain Names, contained links for cellular accessories, cell phone deals and ringtones. Thus, Internet users looking for Plaintiffs' websites are diverted by Defendants to websites with information on goods and services that are directly competitive to Plaintiffs' good and services. [Exhibits D and K to Bradley Dec.] The use of such competitive links is further evidence that these domain names are confusingly similar to Plaintiffs' Marks. *See Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F. 3d 806, 809 (6th Cir. 2004) ("In the Senate Report accompanying the ACPA, cybersquatters are defined as those who: . . . (3) register well-known marks to prey consumer confusion by misusing the

CHRISTIE, PARKER & HALE, LLP

domain name to divert customers from the mark owner's site to the cybersquatter's own site").

Third, Defendants identify the following domain names, which they admit they registered, as "badly misspelled words": *werizonvirales.com, werizonvireles.com, veriosion.com, verisonnerwork.com, vervzon.com, and zerizonwireless.com.* [Opposition, p. 23.] However, courts hold that the misspellings of famous marks, which are intended to catch Internet users who make slight spelling or typing errors, are considered "confusingly similar." *Shields v. Zuccarini,* 254 F.3d 476, 484 (3d Cir. 2001). *See also Ford Motor Company v. Greatdomains.com, Inc.,* 177 F. Supp. 2d 635, 641-42 (E.D. Mich. 2001) ("unless words or letters added to the plaintiff's mark within the domain name clearly distinguish it from the plaintiff's usage, allegations that a domain name incorporates a protected mark generally will suffice to satisfy the 'identical or confusingly similar to' standard").

Finally, in very similar factual situations, courts have found "that Plaintiffs have a significant probability of success on the merits that the domain names at issue here are confusingly similar." *Verizon California Inc. et. al. v. Maltuzi LLC et. al.,* CV 07-1732 PA (JCx) (C.D. Cal)*,* Minute Order of June 11, 2007 at p. 5; *Verizon v. Ultra RPM,* Minute Order, p.6; *Neiman Marcus v. Ultra RPM Inc.*, Minute Order at p. 6. A copy of the order in *Verizon v. Maltuzi* is in the attached as Exhibit P to the Steele Declaration.

**B.     DEFENDANTS REGISTERED AND USED DOMAIN NAMES WITH A BAD FAITH INTENT TO PROFIT**

The ACPA identifies nine separate factors for the Court to examine in order to determine whether Defendants registered the domain names with a bad faith intent to profit from Plaintiffs' Marks. 15 U.S.C. § 1125(d)(1)(B)(i). In their Opposition, Defendants do not address, and therefore concede, that the first four factors (15 U.S.C. §§1125(d)(1)(B)(i)(I) - (IV)) and the last factor (15 U.S.C.

CHRISTIE, PARKER & HALE, LLP

§1125(d)(1)(B)(i)(IX)) support a finding that Defendants registered the confusingly similar domain names with a bad faith intent to profit. As shown below, the remaining factors[8] also support such a finding.

### 1. Defendants Intended to Divert Customers from Plaintiffs

The fifth factor in the bad faith analysis addresses "the person's intent to divert consumers from the mark owner's online location." 15 U.S.C. § 1125(d)(1)(B)(i)(V). Defendants did not stop their unlawful behavior even though they knew that they were registering domain names that were confusingly similar to famous marks. Since Defendants continued to register confusingly similar domain names *even after notice*, Defendants intended to divert consumers from Plaintiffs' websites to their own websites. *See Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.,* 807 F.2d 1110, 1115 (2nd Cir. 1986) (actual or constructive knowledge on infringing acts proves willfulness); *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002) ("Willfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice").

For example, Defendants admit that Navigation Catalyst "had added, dropped, and in some cases, registered Verizon formative domain names since at least as early as 2004." [Opposition, p. 15.] Since the Complaint was served on Defendants, and Defendants had actual knowledge of their unlawful behavior, Defendants have registered at least 37 domain names that are confusingly similar to Plaintiffs' Marks and over 1,500 domain names that are confusingly similar to the other famous marks identified in the Complaint. [Bradley Dec. ¶¶ 8, 9 and Exhibits G and H to Bradley Dec.] In fact, since Plaintiffs filed their Motion for Preliminary Injunction, Defendants have registered at least one domain name confusingly similar to Plaintiffs' Marks and over 250 domain names that are

---

[8] At this early point in the case, prior to discovery, Plaintiffs have no evidence with respect to the sixth factor (15 U.S.C. § 1125(d)(1)(B)(i)(VI)).

CHRISTIE, PARKER & HALE, LLP

confusingly similar to the other famous marks identified in the Complaint. [Steele Dec., ¶12.]

As significantly, Defendants "screening system to identify trademarked domain names" was used ***only after*** they had registered the Infringing Domain Names.[9] [Opposition, p. 6.] Thus, Defendants waited until after registration and violating the ACPA, to determine whether they broke the law in order to try to fix the problem. Of course, any ***post-registration*** trademark screening cannot cleanse Defendants of the taint of cybersquatting.

Defendants also refer to their "revamp[ing]" of existing screening processes in "late 2007" by "adding additional compliance personnel." [Opposition, p. 7.] This is another admission by Defendants that they were aware that some of the domain names they register are identical or confusingly similar to famous or distinctive marks, and recognized that the unlawful behavior demanded additional efforts to minimize exposure to risk. Yet, again, even though Defendants had additional notice of a problem, they did nothing to fix the problem until ***after registration***.

Of course, Defendants still have not initiated a trademark screening process to avoid the registration of domain names that are confusingly similar to famous or distinctive marks that takes place ***before the domain names are registered***. [Opposition, pp. 6, 7, and 10.] Defendants, however, refer to the use of a re-registration "blacklist, which bars domain names from being added again." [Opposition, p. 7.] Defendants thus admit that they have the tools to attempt to prevent the registration of confusingly similar domain names ***before registration.*** Yet, for some inexplicable reason, Defendants only use pre-registration blocking to avoid re-registering domain names that they have already registered in

---

[9] The fact that Defendants needed to implement a *post-registration* manual review only confirms its knowledge that the automated process it used would result in violations of the trademark rights of others. Yet, Defendants did not stop using their flawed automated process.

violation of the ACPA. Of course, Defendants' extremely limited pre-registration blocking is only effective to avoid a second infringing registration of a domain name by Defendants.

Accordingly, this fifth bad faith factor (15 U.S.C. § 1125(d)(1)(B)(i)(V)), strongly supports that Defendants willfully registered the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Marks.

## 2. Defendants Failed to Provide Accurate WHOIS Data

The seventh factor in the bad faith analysis addresses the person's intentional failure to provide or maintain accurate contact information, "or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VII). In their Motion, Plaintiffs presented evidence that, on several occasions between May 30, 2008 and June 5, 2008, Defendants provided no WHOIS data in response to queries for particular domain names known to be registered by Basic Fusion. [Bradley Dec. ¶ 7, Exhibit E. to Bradley Dec.] Defendants' Opposition makes no effort to explain this failure to provide WHOIS data. Rather, Defendants simply "dispute" that they have "failed to make Whois information available subsequent to the filing of this Complaint." [Opposition, p. 9.] The facts, however, belie Defendants' claims.

For instance, with respect to the confusingly similar domain name *vorizonwiorless.com* that was recently registered by Defendants, Plaintiffs were again unable to collect WHOIS data. Whether Plaintiffs utilized Basic Fusion's web interface, or the commercial services DomainTools.com and BetterWhois.com, or by directly connection to Basic Fusion's WHOIS server, in order to determine the registrant of *vorizonwiorless.com*, the following message was returned: "The allowable number of requests has been exceeded. Please

/ / /

/ / /

/ / /

CHRISTIE, PARKER & HALE, LLP

check back later.  We are sorry for any inconvenience." [Steele Dec., ¶¶ 4 - 8, Exhibits A, C, E, G, I to Steele Dec.][10]

Yet, when Plaintiffs utilized the same approaches with respect to a domain name that was not confusingly similar to a famous mark (*i.e., toreent.net*), the complete WHOIS information identifying the registered domain name holder was obtained.  [Steele Dec., ¶¶ 4 - 8, Exhibits A - J to Steele Dec.]

Defendants do not explain why false and deceptive messages are returned only for WHOIS inquiries for confusingly similar domain names.  Instead, Defendants continue to restrict access to WHOIS information with the intention of making it more difficult for trademark owners to police their marks.  As such, Defendants are engaged in a pattern of intentionally failing to provide accurate contact information for many of the domain names they register.

Accordingly, this seventh bad faith factor (15 U.S.C. § 1125(d)(1)(B)(i)(VII)), strongly supports that Defendants registered the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Marks.

### 3. Defendants Registered Multiple Domain Names Which They Knew Were Confusingly Similar to Marks of Others

The eighth factor in the bad faith analysis addresses "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others." 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).  Defendants registered and used (1) at least 15,000 domain names, before the Complaint was filed, which were confusingly similar to 26 other famous marks identified in the Complaint; (2) at least 1,500 domain names, between the filing of the Complaint and the Motion for Preliminary Injunction, which were confusingly similar to the 26 other famous marks; and (3) over 250 domain names, after the Motion was filed, which were confusingly

---

[10]  It should be noted that Plaintiffs employed these different methods in order to ensure that they would not exceed the "allowable number of whois requests."

similar to the 26 other famous marks. [Bradley Dec. ¶¶ 3 and 9, Steele Dec., ¶12.] Defendants also admit that their own consistent registration of infringing domain names was of enough concern that they attempted on three separate occasions over several years to implement corrective post-registration screening. [Opposition, pp. 6, 7, 10, 11, 24.]

Courts consider excessive numbers of infringing domain names as strong proof of bad faith. *Shields v. Zuccarini,* 254 F. 3d at 485 n. 5 (registration of thousands of domain names identical or confusingly similar to the distinctive marks of others reflects a "pattern of behavior . . . consistent with a bad faith intent to profit"). Defendants' cybersquatting business is consistent with a bulk registrant of domain names like Zuccarini (more than 3,000 domain names)[11] and Maltuzi (approximately 435,000 domain names).[12]

As such, this eighth bad faith factor (15 U.S.C. § 1125(d)(1)(B)(i)(VIII)) strongly supports a finding that Defendants registered the over 1,300 Infringing Domain Names with a bad faith intent to profit from the Plaintiffs' Marks.

### 4. Defendants' Other Arguments Do Not Exempt Them From Bad Faith Intent Under the ACPA

In their Opposition, Defendants claim, without any support, that they did not have any bad faith intent because they have an "established policy of transferring disputed domain names" to complaining parties who can establish their trademark rights. [Opposition, p. 9; Jacoby Aff. ¶ 17.] However, Defendants' "policy" of transferring confusingly similar domain names to trademark owners does not protect Defendants from being cybersquatters.[13] As Judge Anderson opined:

/ / /

---

[11] *Shields v. Zuccarini,* 254 F.3d at 486.

[12] *Verizon v. Maltuzi,* Minute Order, p. 1.

[13] Defendant's "policy" is not a factor that the ACPA uses in its examination of bad faith.

> Defendant effectively admits it may infringe Plaintiffs'
> marks, but argues that it cannot be enjoined from doing
> so because it stops infringing upon request.  In the
> absence of any support for Defendant's position,
> Plaintiffs are entitled to preliminary injunctive relief.

*Verizon v. Ultra RPM,* Minute Order, p.7.  Much like a thief, who cannot avoid the consequences of the crime by offering to return the stolen goods after being caught, a cybersquatter cannot be immune from liability or injunctive relief if, after it is caught, it simply agrees to transfer the domain name.  The ACPA, and this Court, must not allow Defendant to shift the burden of complying with the law to the injured party.  *See* S. Rep. 106-140 at 1-2 (cybersquatting "harms the public . . . by placing unreasonable, intolerable, and overwhelming burdens on trademark owners in protecting their own marks").[14]

Defendants also argue that their use was not in "bad faith" because they ceased the use of many of the domain names before Plaintiffs filed the Complaint ("freed the dolphins it caught in its nets").  [Opposition, p. 23.]  However, changing one's illegal behavior (by canceling the offending domain names) does not transform the earlier unlawful action into a lawful one.  *See Shields v. Zuccarini,* 254 F.3d 476, 487 (3rd Cir.  2001) (even though defendant changed his website from commercial to political, it does not "absolve that defendant of liability for his earlier unlawful activities.  Indeed, were there such authority we think it would be contrary to the orderly enforcement of the trademark and copyright laws").  *See also NCR Corp. v. ATM Exch., Inc.,* 81 U.S.P.Q. 2d 1216, 1220 (D. Ohio 2006) ("the Court finds that ATM Exchange's alleged

/ / /

---

[14]  Similarly, Defendant seeks to shift the burden of complying with the ACPA by asking Plaintiffs for terms or phrases that Defendant should add to its "block-list." [Opposition, p. 8.]  Defendant's contention that Plaintiffs bear some burden to help Defendant follow the law is plainly contrary to Congressional intent.

discontinuation of its use of NCR's mark on its website does not absolve it of liability").

Finally, Defendants inexplicably argue that they are not as bad as registrars that engage in "kiting." [Opposition, pp. 23-24.] Defendants provide no authority for such a relativist view of bad faith in which Defendants' conduct is not bad faith because other defendants have committed even worse acts of infringement. The relative goodness of Defendants, as compared to other lawbreakers, finds no support in the statute or the cases and should be rejected.

## III.  PLAINTIFFS ARE BEING IRREPARABLY HARMED

Plaintiffs are entitled to a presumption of irreparable harm because they have shown likely success on the merits of their ACPA claim. *See Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612 n. 3 (9th Cir. 1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted"); *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 208 (6th Cir. 2004) (irreparable harm presumed from infringement of mark in ACPA context); *Advance Magazine Publishers, Inc. v. Gogue International,* 123 F. Supp. 2d 790, 801 n. 16 (D. N.J.  2000) (irreparable harm automatically follows from a finding that the domain names are confusingly similar under the ACPA). *See also MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516-517 (9th Cir.  1993) (a lesser showing of irreparable injury is required when a plaintiff makes a stronger showing of a likelihood of prevailing on the merits of its claim).

Although Defendants point out that it is possible to rebut the presumption of irreparable harm by showing that "the plaintiff has not been harmed [or] the harm is *de minimis*," they have provided no evidence that Plaintiffs were not harmed or suffered only *de minimis* harm. [Opposition p. 13.] Defendants ignore case law holding that "this sort of injury is not easily compensable after the fact,

CHRISTIE, PARKER & HALE, LLP

as it will be nearly impossible to discover how many Internet users did *not* visit [Plaintiffs'] site because of [Defendant's] domain names." *Shields v. Zuccarini,* 89 F. Supp. 2d 634, 641 (E.D. Pa. 2000).

Defendants also ignore their recent registration of *vorizonwiorless.com* on June 11, 2008 when they make the following misrepresentation: "[n]o new Verizon domain names have been *registered* since the blacklist was implemented on May 6, 2008." [Opposition, p. 14.] Of course, Defendants' persistent registration and use of confusingly similar domain names to Plaintiffs' Marks to divert Internet traffic from Plaintiffs to their competitors[15] results in "irreparable harm" to Plaintiffs. *See Verizon v. Ultra RPM*, Minute Order, p. 7 ("Plaintiffs demonstrated that the domain name *dslverizon.com* registered by Defendant featured links to deals on cellular telephones, a product and/or service directly competitive with the products and/or services offered by Plaintiffs. . . . Plaintiffs have therefore made a sufficient showing of both a likelihood of prevailing on their claims and irreparable injury"). Accordingly, even if Defendants could overcome the presumption of irreparable harm, Plaintiffs' actual harm would be sufficient to support the grant of a preliminary injunction.

Finally, Defendants argue, based on rank speculation, that Plaintiffs cannot demonstrate harm because Plaintiffs delayed filing this motion for "well over a year." [Opposition, pp. 14-16.] Defendants have fabricated this timeline based on their own assumptions regarding what information Plaintiffs knew at what time. Plaintiffs' first became aware of the extent of Defendants' cybersquatting

///

---

[15] The websites hosted at most of the Infringing Domain Names display links featuring goods or services directly competitive with those sold or provided by Plaintiffs. For example, the domain names *verisoncell.com* and *fiosbundleterms.com* redirected visitors to web pages displaying advertisements for Quest, US Cellular, and Comcast, all direct competitors of Plaintiffs. [Bradley Dec. ¶ 12 and Exhibit K to Bradley Dec.]

CHRISTIE, PARKER & HALE, LLP

behavior in February of 2008 and began an investigation into the particulars of Defendants activities at that time.  [Steele Dec., ¶2.]

Additionally, Plaintiffs and Defendants have engaged in Settlement negotiation since service of the Complaint in April 2008.  The Ninth Circuit holds that delays caused by settlement negotiations do not bar relief.  *Ocean Garden, Inc. v. Maktrade Co.,* 953 F.2d 500, 508 (9th Cir. 1991).  Since Plaintiffs' delay of two to four months did not harm Defendant,[16] it does not bar Plaintiffs' claim for injunctive relief.  *See Ocean Garden* (preliminary injunction affirmed even though plaintiff waited six months before moving for a preliminary injunction); *see also Goto.com, Inc. v. The Walt Disney Co.,* 202 F.3d 1199, 1204 (9th Cir. 2000) (plaintiff did not delay even though it moved for preliminary injunction four months after it filed its complaint).

## IV.  PLAINTIFFS' ADVANCED SEARCH SERVICE IS LEGAL AND DOES NOT SUPPORT THE DEFENSE OF UNCLEAN HANDS

Defendants claim that Plaintiffs are guilty of unclean hands because the Advanced Search Service is unlawful.  Defendants are mistaken.  Plaintiffs' Advanced Search Service is lawful under the ACPA because it is triggered only when a domain name that **has not been registered** is typed into the browser by a Verizon customer.[17]  [Steele Dec. ¶17.]  The ACPA, however, applies only to the registration, use or trafficking in of **registered domain names.**  *See* 15 U.S.C. §1127 ("The term 'domain name' means any alphanumeric designation **which is registered** with or assigned by any domain name registrar, domain name registry,

/ / /

---

[16]  In *Ocean Garden,* the Ninth Circuit also examined whether the defendant was harmed by the alleged "delay."  *Id.*  Since Defendant fails to provide any evidence that it suffered harm as a result of Plaintiffs' "delay" in filing their Motion, Defendant cannot succeed on its claim of laches.

[17]  Defendants admit that the Advanced Search Service is triggered only when a user types into its Internet browser "domain names and sub-domains *that have not been registered or simply do not exist.*"  [Opposition, p. 4] (emphasis added).

CHRISTIE, PARKER & HALE, LLP

or other domain name registration authority as a part of an electronic address on the Internet") (emphasis added).

Since Plaintiffs' Advanced Search Service is lawful and does not violate the ACPA, Plaintiffs cannot be guilty of unclean hands. Even if Plaintiffs were somehow found to be engaged in wrongdoing, which they are not, the doctrine of unclean hands is narrowly applied to bar protection of the trademark. "The doctrine of unclean hands would preclude enforcement of a trademark only if plaintiff's wrongdoing related to the getting or using of the trademark rights that plaintiff was attempting to enforce." *Flow Control Indus., Inc. v. AMHI, Inc.*, 278 F. Supp. 2d 1193, 1198 (W.D. Wash. 2003) (citations omitted), see also *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963) ("[M]isconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands. The concept invoking the denial of relief is not intended to serve as punishment for extraneous transgressions".)

Defendants have not shown that the Advanced Search Service (the alleged basis for Defendants' claim of Plaintiffs' wrongdoing) is related to the "getting or using" of Plaintiffs' rights in the Plaintiffs' Marks. Courts routinely reject unclean hands defenses in cybersquatting cases where, as here, the alleged wrongdoing does not directly relate to the trademark rights asserted by the plaintiff in the case. *See PETA v. Doughney,* 113 F. Supp. 2d 915, 921 (E.D. Va. 2000) *aff'd*, 263 F.3d 359 (4th Cir. 2001) (even though PETA had engaged in the unauthorized use of domain names containing trademarks of others, "the doctrine of unclean hands applies only with respect to the right in suit. What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts".)

Accordingly, Plaintiffs lawful conduct in providing the Advanced Search Service cannot form the basis of Defendants' unclean hands defense.

/ / /

CHRISTIE, PARKER & HALE, LLP

## V.  THE PROPOSED INJUNCTION IS NOT VAGUE OR OVERBROAD

Plaintiffs' proposed injunction is not overbroad.  Defendants do not challenge Paragraph 1 of the proposed injunction, which is directed at domain names that are identical or confusingly similar to Plaintiffs' Marks.  With respect to Paragraph 2, which prohibits Defendants from using their automated process to register domain names pending trial, even with Defendants alleged modifications to the process, the evidence is overwhelming that violations will continue to occur.  Defendants have designed and implemented a system that has not operated without capturing domain names that are confusingly similar to Plaintiffs' Marks and other famous marks.  If the result of the ordered injunction is to suspend Defendants' operations, Defendant has only itself to blame.[18]

## VI.  CONCLUSION

For the reasons discussed above and in Plaintiffs' Motion for Preliminary Injunction, the Court should grant Plaintiffs' request for preliminary injunctive relief and enter the proposed Order submitted to the Court.


DATED:  June 23, 2008          Respectfully submitted,

          CHRISTIE, PARKER & HALE, LLP


          By /s/David J. Steele
          David J. Steele

          Attorney for Plaintiffs
          VERIZON CALIFORNIA INC.; VERIZON
          TRADEMARK SERVICES LLC; and
          VERIZON LICENSING COMPANY

LLB IRV1114494.3-*-06/23/08 7:13 PM

---

[18]  Plaintiffs do not want to shut down Defendants' business.  Plaintiffs only want Defendants to operate their business in a lawful manner.

CHRISTIE, PARKER & HALE, LLP