O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERIZON CALIFORNIA INC., et al., | CASE NO.: CV 08-2463 ABC (Ex) |
| Plaintiffs, | ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| NAVIGATION CATALYST SYSTEMS, INC., et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction ("Motion"), filed June 9, 2008. Defendants filed their opposition to the Motion on June 16, 2008; Plaintiffs filed their reply on June 23, 2008. The hearing on this matter was held on June 30, 2008. Upon consideration of the parties' submissions, arguments of counsel, and the case file, the Court hereby GRANTS the Motion in part, and DENIES it in part, as set forth below.

**BACKGROUND**

On April 15, 2008, Plaintiffs Verizon California Inc., Verizon Trademark Services LLC, and Verizon Licensing Company ("Plaintiffs") filed this case against Defendants Navigation Catalyst Systems, Inc.

and Basic Fusion, Inc. ("Defendants"). The three Plaintiffs are subsidiaries and affiliates of Verizon Communications, Inc., one of the largest telecommunications companies in the world. (Declaration of Janis M. Manning in Supp. of Mot. for Prelim. Inj. ("Manning Decl."), ¶ 3.) Verizon Trademark Services LLC ("VTS") owns the VERIZON and VERIZON WIRELESS trademarks and trade names, as well as logo versions of these marks (collectively, the "VERIZON marks"), for which it has obtained United States trademark registrations. (Manning Decl., ¶ 4.) Plaintiffs have owned and used the VERIZON marks since at least 2000. (Manning Decl., ¶¶ 8, 12.) VTS also owns the FIOS and VERIZON FIOS trademarks (collectively, the "VERIZON FIOS marks"), and their United States trademark registrations. (Manning Decl., ¶ 5.) Plaintiffs have owned and used the VERIZON FIOS marks since at least 2004. (Manning Decl., ¶ 9.) Finally, VTS owns the VZ, VZACCESS, VZEMAIL, VZGLOBAL, VZVOICE, and VZW trademarks (collectively, the "VZ Marks"), and their United States trademark registrations. (Manning Decl., ¶ 6.) Plaintiffs have owned and used the VZ and VZW marks since at least 2000, and the rest of the VZ marks since 2003. (Manning Decl., ¶ 10.) Plaintiffs operate websites using the following domain names: verizon.com, verizon.net, verizonwireless.com, verizonfios.com, vzw.com, and vzw.msn.com. (Manning Decl. ¶¶ 12-14.)

    Plaintiffs contend that Defendants have registered internet domain names that are confusingly similar to the trademarks and trade names identified above. Plaintiffs assert six causes of action, for: (1) Cybersquatting on Plaintiffs' VERIZON, VZ, and VERIZON FIOS marks, under 15 U.S.C. § 1125(d); (2) Trademark Infringement of the same marks, under 15 U.S.C. § 1114(1); (3) False Designation of Origin of

the same marks, under 15 U.S.C. § 1125(a); (4) Dilution of the VERIZON marks, under 15 U.S.C. § 1125(c); (5) Trademark Infringement of the VERIZON, VZ, and VERIZON FIOS marks, under California Business and Professions Code § 14320 and California common law; and (6) Unfair Competition, under California Business and Professions Code § 17200 and California common law.  In moving for a preliminary injunction, however, Plaintiffs focus on just the first of these claims, arguing that they are likely to succeed on the merits of their claim against Defendants for "cybersquatting."

Defendants, of course, argue that they are not cybersquatters. Defendant Basic Fusion, Inc. ("Basic Fusion") is an internet registrar accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN").  (Affidavit of Seth Jacoby in Supp. of Def.'s Opp. to Pl.'s Mot. for Prelim. Inj. ("Jacoby Aff."), ¶ 2.)  Thus, Basic Fusion can register domain names on behalf of its customers, enabling a customer to reserve a chosen word (or combination of letters) for use in identifying that customer's website.  Basic Fusion specializes in "bulk registration," providing services to those customers seeking to register large numbers of domain names.  (Jacoby Aff., ¶ 2.)

Defendant Navigation Catalyst Systems, Inc. ("Navigation") is an affiliate of Basic Fusion, as well as a customer.  (Jacoby Aff., ¶¶ 1-2.)  Navigation uses Basic Fusion's services to register hundreds of thousands of domain names.[1]  (Jacoby Aff., ¶ 3.)  To register such

---

[1] Defendants point out that Basic Fusion and Navigation are separate legal entities, and that Basic Fusion "does not in any way select or control the selection of domain names registered by Navigation." (Jacoby Aff., ¶ 2.) Basic Fusion just "processes the registration requests made by Navigation." (Jacoby Aff., ¶ 2.) However, Defendants do not appear to argue that there is any basis to
(continued...)

3

large numbers of names, Navigation uses a "proprietary automated tool" to look for domain names not already registered to some other party. (Jacoby Aff., ¶ 4.) Once an un-owned domain name is identified, it is registered (or at least "reserved") with ICANN. (Jacoby Aff., ¶ 4.) The first five days after this registration is known as the "Add Grace Period," during which the new owner of the domain name can test the amount of traffic received by the new site (known as "domain tasting"). (Jacoby Aff., ¶¶ 4, 6.) During this period, the new owner can make full use of the chosen domain name, and no one else can use that domain name as the address for a website. However, during the Add Grace Period, the new owner can drop the domain name for any reason, without charge. (Jacoby Aff., ¶ 4.) If the new owner does not drop the name by the end of the Add Grace Period, it must pay the registration fee for that domain name. (Jacoby Aff., ¶ 4.)

According to Plaintiffs, Defendants "registered" with ICANN at least 1,392 domain names that are confusingly similar to Plaintiffs' marks.[2] (Declaration of Anne F. Bradley in Supp. of Mot. for Prelim. Inj. ("Bradley Decl."), ¶ 2.) For example, Defendants registered ve3rizon.com, veri8zon.net, veri9zonwireless.com, verisonbilling.com, vzstore.com, vzwphones.com, etc. (Bradley Decl., ¶ 2; id. at Exh. A.) Defendants do not actually dispute that these names were at one point "reserved" with ICANN, but assert that the majority of names of which Plaintiffs complain were dropped during the Add Grace Period, after

---

[1](...continued)
distinguish between the two entities for purposes of ruling on Plaintiffs' Motion for a Preliminary Injunction.

[2] Plaintiffs also assert that Defendants have registered thousands of domain names that are confusingly similar to other famous marks, not owned by, or associated in any way with, the instant plaintiffs.

4

Defendants performed their "trademark scrubbing" procedures. Defendants argue that names which are merely "reserved" for a few days and then dropped during the Add Grace Period should not be considered "registered" under the Anticyberquatting Consumer Protection Act, the statute at issue here. However, Defendants do not contest that they made use of the names during the short time they had them "reserved," using them to host at least bare bones websites that provided advertising links to other sites, whose owners paid Defendants for the opportunity. (See Bradley Decl., ¶ 4; id. at Exh. D.) In fact, Defendants' own evidence demonstrates that they do make money from domain names held for only a few days during the Add Grace Period, even if those names are deleted before the end of that period. (Jacoby Aff., ¶ 13.)

The "trademark scrubbing" procedures Defendants describe consist of both automatic and manual components. (Jacoby Aff., ¶¶ 7-8.) Defendants maintain a "blacklist" of terms, and a database of trademarks, and will not register domain names containing these prohibited terms. (Jacoby Aff., ¶ 7.) They have recently added a number of terms to the blacklist, and the list is regularly updated. (Jacoby Aff., ¶ 7.) Several human screeners also review all domain names for trademark compliance purposes before the end of the Add Grace Period. (Jacoby Aff., ¶¶ 7-8.) However, despite these methods (or before they were fully implemented), and according to Defendants themselves, 126 names challenged by Plaintiffs slipped through the screening process, were not cancelled during the Add Grace Period, and were registered to Defendants at the time the Complaint was served. (Jacoby Aff., ¶ 16.) Further, while these procedures may enable Defendants to delete potentially infringing names before the end of

the Add Grace Period, they have not yet been completely successful in preventing such names from being added in the first place. Even after service of the complaint, Defendants continued to add and use new names that Plaintiffs argue are confusingly similar to the VERIZON, VZ, and VERIZON FIOS marks, such as varizonnet.com, veriso.net, versionfiosbundlrs.com, viraizonwireless.com, vzwzone.com, wwwveriizon.com, etc. (Bradley Decl., ¶ 8.) In fact, Defendants added vorizonwiorless.com two days after the Motion for Preliminary Injunction was filed. (Declaration of David J. Steele Filed in Supp. of Reply ("Steele Decl."), ¶ 3.)

Defendants claim that they have a policy of transferring disputed names to trademark owners upon request. (Jacoby Aff., ¶ 17.) They also claim that, upon service of the complaint, they disabled all advertising links displayed in connection with any of the 126 challenged domain names they still owned at that time, and then transferred those domain names to Plaintiffs. (Jacoby Aff., ¶ 16.) Finally, they note that they would have done the same had Plaintiffs requested it, without the necessity of a lawsuit being filed. (Jacoby Aff., ¶ 17.)

**LEGAL STANDARD**

The Ninth Circuit has articulated two tests for analyzing requests for preliminary injunctions. <u>Freecycle Network, Inc. v. Oey</u>, 505 F.3d 898, 902 (9th Cir. 2007). "Under the 'traditional' criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." <u>Id.</u> (internal quotations omitted). Under the "alternative"

test, the plaintiff must show "<u>either</u> a combination of probable success on the merits and the possibility of irreparable injury <u>or</u> that serious questions are raised and the balance of hardships tips sharply in his favor." <u>Id.</u> (internal quotations omitted). At a minimum, though, the plaintiff must raise at least "serious questions" about the likelihood of success on the merits, or no injunction will issue. <u>Id.</u> Further, when implicated, the public interest must also be considered. <u>Department of Parks & Rec. v. Bazaar Del Mundo Inc.</u>, 448 F.3d 1118, 1124 (9th Cir. 2006).

The "alternative" test is a sliding scale, or continuum. <u>Bazaar Del Mundo</u>, 448 F.3d at 1123; <u>Southwest Voter Registration Ed. Proj. v. Shelley</u>, 344 F.3d 914, 918 (9th Cir. 2003). Thus the greater the probability of success, the less sharply the balance of hardships must tip toward the plaintiff. <u>Bazaar Del Mundo</u>, 448 F.3d at 1123. Conversely, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tips in their favor." <u>Southwest Voter Registration</u>, 344 F.3d at 918.

The normal calculus is altered somewhat in a trademark infringement case, in that "[i]rreparable injury is ordinarily presumed upon a showing of a likelihood of success." <u>Abercrombie & Fitch Co. v. Moose Creek, Inc.</u>, 486 F.3d 629, 633 (9th Cir. 2007); <u>Visions Sports, Inc. v. Melville Corp.</u>, 888 F.2d 609, 612 n.3 (9th Cir. 1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.").

**DISCUSSION**

**I. Likelihood of Success on the Merits**

Plaintiffs argue that they are likely to succeed on the merits of their cybersquatting claim against Defendants. Under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125 (d), cybersquatting "'occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.'" Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 680 (9th Cir. 2005) (quoting DaimlerChrysler v. The Net Inc., 388 F.3d 201, 204 (6th Cir. 2004)). The ACPA has also been interpreted as prohibiting "typosquatting" -- that is, registering intentional misspellings of famous trademarks or names. Shields v. Zuccarini, 254 F.3d 476, 484 (3d Cir. 2001) ("A reasonable interpretation of conduct covered by the phrase 'confusingly similar' is the intentional registration of domain names that are misspellings of distinctive or famous names, causing an Internet user who makes a slight spelling or typing error to reach an unintended site.").

The ACPA authorizes a trademark owner to bring a civil suit against any person who: "(i) has a bad faith intent to profit from that mark . . . ; and (ii) registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to or [in certain cases] dilutive of that mark . . . ." 15 U.S.C. § 1125(d)(1)(A). Thus, there are three possible questions at issue here: whether Defendants "registered, trafficked in, or used" the domain names identified by Plaintiffs; whether those domain names were "confusingly

similar" to Plaintiffs' trademarks; and whether Defendants had a "bad faith intent to profit" from those domain names.

Defendants do not really argue that the challenged domain names here are not "confusingly similar" to Plaintiffs' trademarks. In passing, they make reference to the fact that some few of the names at issue "contain so many spelling errors -- and are so unlikely to be typed in by users -- that it is difficult to conceive of exactly what harm Verizon would suffer from their addition and deletion during the Add Grace Period." (Defs.' Mem. of Ps. & As. in Opp'n to Mot. for Prelim. Inj. ("Defs.' Mem."), at 17.) They also argue that their registration of a few "scarcely recognizable" domain names should not support a finding of bad faith. (Defs.' Mem. at 22.) However, they never make the argument that the names they registered are not sufficiently close to Plaintiffs' marks to satisfy ACPA's requirement. Nor could they, especially in light of the fact that similarity here is judged not just by appearances, but by the likelihood that a particular domain name might be typed in accidently by someone trying to type in one of Plaintiffs' marks or domain names. Shields, 254 F.3d at 484. For instance, at issue are ve3rizon.com and veri8zon.net, both of which consist of Plaintiffs' actual domain names, including Plaintiffs' trademarks, plus one extra character -- in both cases a character located on the computer keyboard next to a letter found in the correct domain name, making any websites using those domain names one easily-made typo away from Plaintiffs' primary domains.

Nor do Defendants ever argue that the domain names at issue are dissimilar enough from Plaintiffs' marks that Defendants should be entitled to continue using them. Rather, Defendants have expressed no

desire to keep any of the names identified by Plaintiffs, asserting instead that they had already abandoned most of the names before the complaint was filed, and that they are attempting to divest themselves of any remaining names as quickly as possible.

While Defendants do not challenge the "confusingly similar" nature of the domain names at issue here, they do argue that they did not "register" most of those marks, since for most names all they did was "reserve" them for the Add Grace Period. Defendants attempt to distinguish "reserving" from "registering" by pointing out that no payment is necessary for names abandoned during the Add Grace Period, but this argument has no merit. There is nothing in the statute that defines "registration" as complete only upon payment, and Defendants have pointed to nothing to show that Congress intended "registration" to hinge on payment. Further, "reserving" versus "registering" is a distinction without a difference -- either here entitles Defendants to the exclusive control and use of the names at issue, at least for some period of time.

However, even if there were some significant difference between "reserving" and "registering," such that Defendants should not be considered as having "registered" names they dropped during the Add Grace Period, this would gain Defendants nothing. All indications show that Defendants "used" the domain names they had "reserved" during the Add Grace Period. That is, they hosted websites using the challenged domain names, on which were posted paid advertising links to other websites, in some instances selling products in direct competition with Plaintiffs. Thus even if Defendants never "registered" any of the challenged names, the statutory requirement would be satisfied nonetheless. 15 U.S.C. § 1125(d)(1)(A)(ii)

("registers . . . <u>or</u> uses a domain name" (emphasis added)). Finally, even if "registration" were required, Defendants clearly <u>did</u> register -- even using their own definition of the term -- at least 126 confusingly similar marks, including, for example, verizno.net, verisonnetwork.com, verisonwirelessplans.com, and vzstore.com. (Jacoby Aff., ¶ 16; <u>id.</u> at Exh. G.)

Defendants also argue that they lacked the "bad faith intent to profit" required by ACPA. However, they completely fail even to acknowledge, let alone discuss, that there are nine factors provided by the statute that should be considered in determining whether a defendant has the requisite bad faith for liability. In determining whether a defendant has acted in "bad faith," ACPA provides that "a court may consider factors such as, but not limited to":

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the

11

person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

A review of these factors makes clear that Defendants had the requisite "bad faith." They do not claim to have any intellectual property rights in any of the domain names at issue; nor do they claim that any of these names consists of any Defendant's legal name, or the name of any individual associated with any of Defendants. Nor is there any history of a prior use by Defendants of any challenged name in connection with either the bona fide offering of any commercial goods or services, or any noncommercial or fair use. The first four factors thus support a finding of bad faith.

The fifth factor also cuts strongly against Defendants. It is clear that their intent was to profit from the poor typing abilities of consumers trying to reach Plaintiffs' sites: what other value could there be in a name like ve3rizon.com? Further, the sites associated with these names often contained links to products directly competitive with Plaintiffs' cellphone and internet businesses, potentially diverting consumers who would otherwise have purchased goods or services from Plaintiffs away from Plaintiffs. Defendants clearly intended "to register a domain name in anticipation that

consumers would make a mistake, thereby increasing the number of hits [their] site would receive, and, consequently, the number of advertising dollars [they] would gain." Shields, 254 F.3d at 484.

In addition, it is clear that Defendants acquired thousands of domain names that were confusingly similar to any number of famous marks. And some of the marks to which their domain names are confusingly similar are unquestionably "distinctive and famous," including some of Plaintiffs'. Thus, the eighth and ninth factors also strongly support a finding of bad faith.

The seventh factor is somewhat inconclusive. Plaintiffs have offered evidence that, since the complaint was filed, Defendants have not maintained proper "WHOIS" data for all of their sites, but Defendants contest this point. Given the weight of other evidence against Defendants, though, it is not necessary to make any finding regarding Defendants' WHOIS data at this time. Even if this factor were assumed to tip in Defendants' favor, it would not be enough to change the overall balance.

On the other hand, Defendants have not offered to sell the challenged domain names, but have apparently transferred them to Plaintiffs without compensation. Thus, the sixth factor does favor Defendants. However, as nothing else appears to favor Defendants, this factor alone cannot outweigh the rest of the evidence presented that Defendants acted with the "bad faith" required by the statute.

Plaintiffs have therefore made a strong showing that they are likely to prevail on the merits of their cybersquatting claim. Defendants, acting with a "bad faith intent to profit," registered and/or used numerous domain names that are confusingly similar to Plaintiffs' trademarks.

**II. Irreparable Injury**

Irreparable injury is generally presumed in a trademark action, once the plaintiffs make a showing that they are likely to succeed on the merits. <u>Abercrombie & Fitch</u>, 486 F.3d at 633; <u>Visions Sports</u>, 888 F.2d at 612 n.3. Such a showing has clearly been made here. Defendants contend they can rebut such a presumption, and argue that Plaintiffs cannot show they would suffer irreparable injury in the absence of an injunction because they delayed in seeking such relief. However, Defendants present no evidence that there was any delay, just speculation. On the other hand, Plaintiffs present affirmative evidence that there was no significant delay. Plaintiffs also present evidence that Defendants are continuing to register <u>new</u> domain names that likely violate ACPA -- after the complaint was filed, and even after the motion for a preliminary injunction was filed. Thus, this is not a case where Defendants have been using the challenged names for years while Plaintiffs sat on their rights. The problem at this point lies not with domain names that Defendants have been using for some time, but with the fact that they continue to acquire new ones that affect Plaintiffs.

Defendants also argue that, presumption aside, there is no evidence of actual harm here. This is incorrect. Even if Plaintiffs were not entitled to any presumption of harm, they have sufficiently demonstrated that there is a risk such harm will occur. Since the filing of the complaint, Defendants have continued to acquire new domain names that are confusingly similar to Plaintiffs' marks. Even if they are able to identify and cancel all of those names within the Add Grace Period, there is nonetheless a period of several days for each domain name when Defendants use that name to generate revenue by

linking to other websites, some of which offer products and services that compete with Plaintiffs'. (Bradley Decl., ¶ 4; id. at Exh. D; Steele Decl., ¶¶ 3, 10; id. at Exh. L.) Determining later just how much internet traffic was diverted from Plaintiffs' sites to competing sites through Defendants' briefly held, and constantly changing, similar domain names, is likely to prove impossible. Thus, especially given the strength of Plaintiffs' showing that they will succeed on the merits of their cybersquatting claim, they have sufficiently shown that they will suffer irreparable harm if some injunctive relief is not granted.

**III. Balance of Hardships**

Having held that Plaintiffs are quite likely to succeed on the merits of their cybersquatting claim, and that they have both a presumption and actual evidence of irreparable harm on their side, it is clear that any weighing of hardships here is poised to tip heavily in Plaintiffs' favor. That is, at least as far as any injunctive relief against Defendants' use of domain names that are confusingly similar to Plaintiffs' marks is concerned. Defendants express no interest in keeping any of the challenged names, and profess to have instituted significant new procedures to prevent similar names from being registered in the future. Nonetheless, the Court is not convinced that Defendants will discontinue their behavior completely in the absence of an injunction. Defendants' "trademark scrubbing" efforts appear directed at deleting potentially infringing domain names before the end of the Add Grace Period, rather than preventing the addition of such names in the first place. As Defendants continue to use domain names during the Add Grace Period, the distinction is important. The use of "confusingly similar" domain names during the

15

Add Grace Period is within the scope of the harms the ACPA was enacted to prevent.

That part of the requested relief that would prohibit Defendants from using any automatic registration process, however, is a different story. Plaintiffs have not shown that they will not be sufficiently protected by an injunction preventing Defendants from using domain names that are confusingly similar to their marks. If Defendants register such a mark, whether manually or automatically, that would violate the injunction. If no such marks are registered, Plaintiffs will have achieved the relief they want, regardless of whether Defendants continue to register non-infringing marks using an automatic process. Forbidding automatic registration would essentially shut down Defendants' business completely, which is not justified on the record currently before the Court. Further, Plaintiffs have not shown that automatic registration cannot ever be conducted in a permissible fashion.

**IV. Equitable Considerations**

Defendants also claim that Plaintiffs have "unclean hands" on the issue of "monetizing typo traffic," and so should not be granted the equitable remedy of an injunction. Nothing presented by Defendants suggests that Plaintiffs have engaged in any illicit or prohibited behavior, however. Thus, there is no basis on which to consider Plaintiffs's actions as giving rise to an "unclean hands" defense.

**CONCLUSION**

This Order shall constitute the Court's findings of fact and conclusions of law on this issue. Based on the findings and conclusions set forth above, the Court hereby GRANTS in part, and DENIES in part, Plaintiffs' Motion for a Preliminary Injunction.

Plaintiffs' request for an order enjoining Defendants from registering any domain name using an automated process is DENIED.  However, the Court will issue a Preliminary Injunction enjoining Defendants from registering or using any domain name that is identical or confusingly similar to the following marks:  VERIZON, VERIZON WIRELESS, FIOS, VERIZON FIOS, VZ, VZACCESS, VZEMAIL, VZGLOBAL, VZVOICE, and VZW.  Defendants will be further enjoined from assisting, aiding, or abetting any other person or business entity in registering or using any domain name that is identical or confusingly similar to these same ten marks.  As the injunctive relief ordered is relatively modest, the Court orders Plaintiffs to post a $10,000.00 bond within ten days of the date of entry of the Preliminary Injunction.  If Plaintiffs fail to post the bond in a timely manner, the Preliminary Injunction will be vacated.

**IT IS SO ORDERED.**

**DATED:**     June 30, 2008

_____

**AUDREY B. COLLINS**
**UNITED STATES DISTRICT JUDGE**